Edward J. Greenfield, J.
After a Huntley hearing on the admissibility of alleged oral statements made by the defendant, the court, with two exceptions, has overruled the objections of the defendant, and found the statements to have been made voluntarily, and with full knowledge of the rights comprised in the so-called Miranda warnings. The remaining two situations involve considerations of basic fairness and justice in the procedures to be followed with a defendant in custody as to which the opinion of the court may serve as a guide to eliminate doubt as to the appropriate course of conduct to be followed.
Defendant was arrested for the crime of murder allegedly committed in the early morning hours of October 25, 1972. At his apartment, the first police officer on the scene gave him the Miranda warnings, including his right to remain silent, that anything he said could be held against him, and that he could have the services of a lawyer. Defendant made some remarks nevertheless. Then the detective on the scene also gave defendant the warnings, and defendant gave a partially exculpatory statement. He was then taken to the precinct house, again apprised of his rights, and again related his version of events. An Assistant District Attorney appeared on the scene with a stenotype reporter, advised defendant of his *117 rights on the record, and then proceeded with questions and answers which were recorded and transcribed.
While defendant readily admitted his presence on the scene, and a fight with the deceased, he at all times steered clear of any direct admission that he had stabbed the deceased. When first asked about the knife, he emphatically declared:
"I will never testify to that until the day I die.”
A little while later, having described a knife which he carried, and having explained why he carried it, he was shown the purported murder weapon, and the following ensued:
"Q. Is this the knife you stabbed A1 with?
"A. Was that the knife? I take the fifth. I didn’t plan to stab nobody and God is my witness.
"Q. You didn’t plan to but is this the knife?
"A. I say I take the fifth.
"Q. What does that mean?
"A. Fifth Amendment.”
Being a compulsive and virtually nonstop talker, he admitted ownership of the knife, and described the circumstances leading up to his fight with the deceased. Then he was asked:
"Q. How have you opened the knife?
"A. Open it with either hand. I guess you looking for a verdict, conviction, you know, any kind of way. I’m not a killer.
"Q. All I’m looking for is the truth.
"A. You got it from me. I tell you I’m not gonna condemn myself. No more statement without a lawyer. I give you, I defended myself on the statement. I’m not gonna give you, no sir, how I open that knife. I’m not.”
The questioning did not terminate at that point. Instead, the detective who was present tried to reassure the defendant to keep talking. He told the defendant that the Assistant District Attorney was just trying to get the facts, as he would be the one to present the case to the courts. He said, "He’ll make the decision as to whether or not it’s murder one as we discussed before or assault, or self-defense, whatever it may be. We’re not trying to hurt you.”
Thereupon the defendant continued talking, saying, "I apologize for speaking nasty to all of you.” And again, "You’re the D.A. doing your job. I’m sorry for my rudeness.”
When defendant indicated a reluctance to be pressed fur *118 ther about the details of the killing, and especially when he emphatically declared, "No more statement without a lawyer”, the Assistant District Attorney should have then and there desisted from further interrogation.
"It was constitutionally impermissible * * * to have questioned defendant after she requested counsel. In Miranda v Arizona (384 US 436, 474, supra), it was held that if a defendant requests an attorney 'before speaking to police, they must respect his decision to remain silent.’ * * * Moreover * * * she had not receded from her position that she would not submit to questioning without counsel present.” (People v Paulin, 25 NY2d 445, 450.) Giving the appropriate Miranda warning at the outset that the defendant need not talk, and that he would be entitled to a lawyer at all stages of the proceeding would be meaningless if later, when the need becomes apparent, the request to refrain from further questioning until a lawyer is present goes unheeded. (Cf. People v Arthur, 22 NY2d 325.) It is true that upon receiving a reassurance which might not have been totally accurate ("We’re not trying to hurt you”), and upon being impressed with the power of the Assistant District Attorney over his case, defendant became apologetic and continued to talk. The Assistant District Attorney, however, should have given heed to defendant’s resistance to further questioning and his desire for a lawyer, and refrained from putting further questions to him. Certainly he should not have acceded to the attempt to dissuade the defendant from insisting on his right to silence and the presence of counsel. The right is substantial and meaningful, and it should be respected, rather than regarded as an obstacle which could be cleared out of the way by persuasion and pressure. Knowing, as he did, that he was dealing with a highly volatile defendant whose flow of words was rapid and ever-gushing, and that if there was a continuing silence the defendant would inevitably rush in to fill it, the Assistant District Attorney should have cut off the examination then and there. Defendant, without a professional advisor, had indicated uneasiness and a reluctance to proceed, transformed to a refusal to go any further. He was trying to defend himself, and to explain his actions. For the Assistant District Attorney to sit and listen to another person urge the defendant to withdraw his objections, and then to wait until the voluble defendant resumed his torrent of words was, in my opinion, not the appropriate conduct called for by the *119 circumstances. That is so even though defendant, in his anxiety to exculpate himself, later invited his questioner to "ask me anything.”
During the Huntley hearing, the court indicated that it was prepared to exclude that part of the statement which followed defendant’s announced refusal to proceed without a lawyer. However, since the statements made thereafter were largely exculpatory and explanatory, defense counsel decided to withdraw the objection, even though the court was ready to suppress those statements.
A second question as to the propriety of the procedures arises from the circumstances subsequent to the interrogation. Throughout the interrogation defendant, while admitting his presence on the scene, his quarrel with the deceased, and his ownership of a knife, continuously resisted making the ultimate admission that he had used the knife to kill the deceased.
Once the interrogation was over defendant was booked and then asked whether he could make a phone call. He was then in the custody of Patrolman McKenna, who dialed the requested number for him in one of the offices of the police precinct. The person with whom the defendant wished to communicate was his minister, one Bishop Hicks. When the connection was made, Patrolman McKenna testified in the pretrial hearing, the defendant said in a loud, clear voice "Bishop Hicks, praise the Lord, I need your prayers, I have killed a man.” This was the first direct admission by the defendant that he had actually carried out the killing. Patrolman McKenna was in the same room when this announcement was made over the telephone to defendant’s minister.
Ordinarily, communications between a penitent and his minister are regarded by the law as privileged. (CPLR 4505.) This confidential communication can be waived if it is uttered under conditions negating confidentiality as is the case with other statutory confidential communications. (Matter of City Council of City of N. Y. v Goldwater, 284 NY 296, 300.) Thus, a statement otherwise confidential loses the privilege when it is made in the presence of a third person. (Baumann v Steingester, 213 NY 328.) It is here urged that communication between the defendant and his minister, which would otherwise be privileged, can be the subject of court testimony because it was uttered over the telephone in the presence of a police officer. Patrolman McKenna was not, however, in the position *120 of an ordinary third person. Defendant had been taken into custody, and it was Patrolman McKenna who was entrusted with that custody. He could not very well leave the defendant, who had been charged with murder, unguarded.
Under those circumstances, how was the defendant to exercise the privilege accorded to him by statute, to communicate confidentially with his minister? It seems to me that one of two alternative courses should have been followed. Either defendant should have been permitted to make his telephone call in privacy by allowing him to use a telephone booth, or a room in which he could close the door and exclude others. This still would not prevent the person guarding him from being immediately outside the door.
If no such facilities are available, and the defendant in custody has a desire to unburden himself either to his wife, his lawyer, or his minister, the right of confidentiality should be respected. If facilities are lacking for a telephone call to be made under conditions of privacy, then an appropriate warning should be given to the defendant that he has a right to make a confidential call, but that anything that is overheard may be held against him. Thus, forewarned he could ask the custodial officer to retreat to a safe distance while he communicated in hushed tones.
To give defendant a Miranda warning prior to interrogation becomes a meaningless exercise if a defendant thus put on guard in an interrogation relaxes his guard and makes a statement after the interrogation is over. This defendant had been told that anything he said could be held against him, and throughout his interrogation with his questioner sitting opposite him, and a reporter taking down his words on a stenotype machine, he was constantly on guard. Not being experienced in criminal situations, it is easy to understand how he failed to appreciate that subsequent presumably privileged communications, overheard by a custodian, could likewise be held against him. Relaxed, and talking to his clergyman, he suddenly finds that what he has said may be testified to by the person whose presence in the room he believed to be required by law and circumstances.
If Miranda type warnings are to have actual and not merely theoretical applicability, the defendant must be made aware of the possibility of his words being used against him at all stages, and not merely during interrogation. Thus, when defendant seeks to communicate with a person and that *121 communication would ordinarily be deemed privileged, those who hold him in custody should either (1) afford him the right to make that communication in conditions of privacy or (2) warn him that if his utterances are overheard, they may be testified to by the person overhearing them, or (3) bar all hearers from testifying to confidential communications overheard by them when conditions of privacy are not accorded and appropriate additional warnings are not given.
I hold that under the circumstances testified to in this case, where the defendant was not accorded the right to communicate with his minister in complete privacy, and where he was not warned beforehand that his statements to the minister, like his statements to the policeman and Assistant District Attorney, could be held against him, the emotional and spontaneous disclosures uttered over the telephone to the minister cannot, in fairness and decency, be testified to by the custodial police officer who overheard his words.
The motion to suppress accordingly is granted with respect to the contents of the alleged telephone call by the defendant and his minister.