THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JAMES HARRELL, Appellant.

Second Department, May 24, 1982

**APPEARANCES OF COUNSEL**

*A. Brent Blacksburg* for appellant.

*Kenneth Gribetz, District Attorney* (*Linda M. Vodar* of counsel), for respondent.

**OPINION OF THE COURT**

MOLLEN, P. J.

This appeal presents the issue of whether a custodial statement, made by a youthful suspect to his parent, is admissible at trial. The statement was introduced in evidence through the testimony of a detective who had overheard it as he stood near the cell in which the suspect and his parent were conversing.

On January 1, 1980, at approximately 1:15 P.M., the defendant and two companions entered the Valcrest Stationery Store in Rockland County. They were assisted first by Michael Mason, an employee of the store, and then by Bernard Epstein, the store's owner. The three men made no purchase and as they began to leave a carton of cigarettes fell from underneath the defendant's coat. He retrieved it and left the store.

Mason, who had seen the defendant drop the cigarettes, called out for him to stop. When the defendant ignored the request, Mason alerted Epstein and the two followed the defendant out of the store. As they approached the defendant on the street, Epstein told him to "put the stuff down and take off." The defendant removed a carton of cigarettes from inside his coat and placed it on the ground. As Epstein stepped forward to retrieve it, the defendant produced a knife and cut him on the finger, stabbed him in the side, and slashed him across the top of the head. The defendant and his companions then fled on foot. Epstein, bleeding profusely from his wounds, lay on the sidewalk and was soon surrounded by a group of civilians.

Within minutes, arriving police learned that three black men had been involved in the incident and that one was wearing a black coat with a white collar and another was wearing a brown coat. The three were seen carrying cigarettes and running toward a nearby apartment house complex located approximately one eighth of a mile from the scene of the crime. This information was quickly broadcast over police radio channels.

Minutes later, Officer Neal Sweeny arrived at the apartment complex. As he approached on foot, he saw a black man peering around the corner of one of the buildings. When Sweeny looked in his direction, the man quickly pulled his head back. Sweeny then turned the corner and saw three black men running away from him. One was wearing a black coat. Another wore a brown coat. All were carrying cigarette cartons under their arms.

Sweeny ordered the men to stop and, when they continued running, the officer pursued. The chase ended when a patrol car blocked the suspects' escape route.

One of the men managed to elude the police by jumping through a basement window. A second man, later identified as William Heath, was seized by arriving officers. He was wearing a black coat.

The defendant, who was wearing a brown coat, was cornered by Officer Sweeny. He did not surrender, however, choosing instead to fight with Sweeny and to resist the officer's efforts to place him in handcuffs. Sweeny required the assistance of another officer to subdue the defendant, and in the course of the struggle, the defendant appeared to be reaching inside his coat where officers later found a butcher knife. The defendant was also found to be in possession of cigarettes.

Although the defendant was advised of his constitutional (*Miranda*) rights, he was not interrogated regarding the incident. At the precinct, the police attempted to contact his mother, leaving a message for her with his aunt. Later that evening, the defendant's mother arrived at the station house and was escorted to her son's cell by Detective John Twomey. As she entered the cell, and with Twomey standing nearby, she asked the defendant if he had stabbed anyone, and he replied, "Yes". She asked him, "Why?" He replied that he "didn't know". This exchange was overheard by Detective Twomey, and he was permitted to testify to it at trial.

The day after the incident, Sweeny and another officer were assigned to transport the defendant and Heath to court for arraignment. During the ride, both officers overheard a conversation between the two suspects who were seated together in the back of the patrol car. In essence, Heath told the defendant that he had done a stupid thing. The defendant replied that he had cut Epstein because the storeowner had placed his hand on him. Testimony regarding this conversation was also received at trial.

■ On appeal from his conviction for robbery and other related offenses, the defendant's primary challenge is directed at the admissibility of the two overheard statements. We agree with the County Court that the defendant's statement to Heath in the patrol car was spontaneous and not the product of custodial interrogation. Accord-

ingly, it was properly ruled admissible. (See, e.g., *People v Kaye,* 25 NY2d 139.)

The defendant's statement to his mother, however, presents a more difficult issue, and one that has not been fully addressed by the courts of this State.

At the time of the offenses charged, the defendant was 17 years old. It was undoubtedly his youth that prompted the police, acting on their own initiative, to contact his mother. The defendant's statement was overheard when Detective Twomey insisted on accompanying the defendant's mother to his cell and on remaining nearby as she entered. The detective later justified his actions as necessary for "security" reasons, and, indeed, the defendant had earlier demonstrated a strong propensity for violence. Not only had his attack upon Epstein been an act of unprovoked brutality, but even when cornered and surrounded by police, the defendant had strenuously resisted arrest. Moreover, there was testimony that, when he arrived at the precinct, the defendant continued his belligerent posture, pushing and shoving when his handcuffs were removed.

Although there was no definite indication that the defendant would actually turn violent against his own mother, Detective Twomey's insistence on accompanying her to the cell for "security" reasons cannot be deemed a sham, undertaken in an attempt to overhear potentially incriminating conversations. (Cf. *People v Grimaldi,* 52 NY2d 611.) Nevertheless, the absence of active police misconduct is not dispositive of the question of the admissibility of the defendant's statement.

As our courts have recognized, when a minor is arrested for a crime, it is only natural that, in the first instance, he should regard his parents, rather than a lawyer, as a source of assistance and advice. Thus, the law will brook no police conduct aimed at isolating a youthful suspect from his family. (See, e.g., *People v Bevilacqua,* 45 NY2d 508; *People v Townsend,* 33 NY2d 37; *People v Rivera,* 78 AD2d 556; *People v Evans,* 70 AD2d 886.) Nevertheless, although the cases have generally required the police to permit parent-child access following an arrest, they have not spoken definitively on the admissibility of statements made

by a youth in custody to his parent. This is in marked contrast to the views expressed with respect to statements made by a suspect to his attorney, which have been held to be absolutely privileged. Thus, for example, in *People v Harris* (84 AD2d 63, 108), this court held that, once the right to counsel has attached, "no statement which a suspect directs to his attorney may be reported at trial by a police officer, regardless of whether he intentionally or inadvertently overheard it."

Unlike conversations between a suspect and his attorney, however, communications between parent and child do not enjoy the protection of the Sixth Amendment, nor are they privileged either under common law or by statute. Nevertheless, in certain circumstances, such communications have been shielded from inquiry. In *Matter of A. & M.* (61 AD2d 426), witnesses appearing in a Grand Jury probe of an alleged arson testified that a 16-year-old boy had been present at the scene of the fire. The prosecutor issued subpoenas to the boy's parents, seeking to have them testify as to admissions he made to them in the privacy of their home. The court held that the parents could validly resist such inquiry by asserting a privilege which arises out of the constitutional right to privacy. The court wrote (p 429): "Although the communication is not protected by a statutory privilege, we do not conclude that it may not be shielded from disclosure. It would be difficult to think of a situation which more strikingly embodies the intimate and confidential relationship which exists among family members than that in which a troubled young person, perhaps beset with remorse and guilt, turns for counsel and guidance to his mother and father. There is nothing more natural, more consistent with our concept of the parental role, than that a child may rely on his parents for help and advice. Shall it be said to those parents, 'Listen to your son at the risk of being compelled to testify about his confidences?'" (See, also, *Matter of Michelet P.*, 70 AD2d 68, dealing with a statement by a juvenile delinquent to a person acting as his guardian pursuant to subdivision [a] of section 724 of Family Court Act.) Similarly, in *People v Fitzgerald* (101 Misc 2d 712), the defendant was charged with criminally negligent homicide arising out of the hit-

and-run death of a girl on a snowy December evening. The prosecutor subpoenaed the defendant's father, seeking to have him testify at trial as to a Christmas Eve conversation he had had with his son regarding the incident. The court precluded such testimony, holding that a parent-child privilege "can and does exist, grounded in law, logic, morality and ethics" (*supra,* at p 713).

We agree that a parent-child privilege does arise in certain circumstances, and in our view, that privilege is rarely more appropriate than when a minor, under arrest for a serious crime, seeks the guidance and advice of a parent in the unfriendly environs of a police precinct. As noted earlier, the courts have recognized that, for such a youth, his parent is the primary source of assistance. It would not be consistent with basic fairness to exact as a price for that assistance, his acquiescence to the overhearing presence of government agents.

■ We conclude, therefore, that a privilege did arise in the circumstances at bar, and we turn next to the question on the scope of the privilege. At the outset, we decline to accord to parent-child communications the same absolute protection afforded to statements directed by a suspect to his attorney. (See *People v Harris,* 84 AD2d 63, *supra.*) The "special solicitude" shown by our courts for an accused's right to counsel (see *People v Cunningham,* 49 NY2d 203, 207) has not been expressed for parent-child communications.

Rather, we find appropriate the approach taken in *People v Brown* (82 Misc 2d 115, GREENFIELD, J.). There the defendant was arrested for murder. He was advised of his rights and was interrogated. He admitted being present at the scene and acknowledged that he had had a fight with the deceased. He further admitted ownership of the murder weapon. However, he assiduously avoided any suggestion that he had killed the victim. Following the interrogation, the defendant asked to call his minister. An officer dialed the number and, as he stood nearby, he overheard the defendant say in a loud, clear voice (p 119), " 'Bishop Hicks, praise the Lord, I need your prayers, I have killed a

man.'" This was the defendant's first direct admission of homicide.

Noting that a communication to a minister is ordinarily privileged, the court suppressed the statement, holding that (pp 120-121): "when [a] defendant seeks to communicate with a person and that communication would ordinarily be deemed privileged, those who hold him in custody should either (1) afford him the right to make that communication in conditions of privacy or (2) warn him that if his utterances are overheard, they may be testified to by the person overhearing them, or (3) bar all hearers from testifying to confidential communications overheard by them when conditions of privacy are not accorded and appropriate additional warnings are not given."

We find this approach both fair and reasonable. Applying it here, we hold that the defendant's statement to his mother should have been suppressed, as Detective Twomey neither afforded the defendant privacy nor gave him appropriate additional warnings.

Having so concluded, we turn next to the question of whether the failure to suppress requires reversal. After a careful reading of the record we are convinced that it does not.

The defendant was unequivocally identified by both Epstein and Mason. He was apprehended shortly after the crime not far from the site of its commission. He was wearing the brown coat which witnesses at the scene had described. He was in possession of the stolen cigarettes. He had a butcher knife concealed on his person. And he made an inculpatory statement to Heath as they were being transported for arraignment. Thus, even without the statement to his mother, the defendant's guilt was established by overwhelming evidence. Accordingly, we hold that the introduction of the statement, although error, was harmless beyond a reasonable doubt (see *People v Sanders,* 56 NY2d 51; *People v Crimmins,* 36 NY2d 230; *People v Harris, supra*).

We have examined the defendant's remaining contentions and find them to be without merit.

TITONE, GIBBONS and THOMPSON, JJ., concur.

Judgment of the County Court, Rockland County, rendered May 16, 1980, affirmed.