**STATE of Minnesota, Respondent,**

v.

**Stafon Edward THOMPSON, Appellant.**

**No. A09–1077.**

Supreme Court of Minnesota.

Sept. 16, 2010.

Lori Swanson, Attorney General, St. Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Michael Richardson, Assistant County Attorney, Minneapolis, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Bridget Kearns Sabo, Assistant State Public Defender, St. Paul, MN, for appellant.

## OPINION

MEYER, Justice.

Stafon Edward Thompson was charged with two counts of first-degree premeditated murder and two counts of first-degree murder while committing aggravated robbery for the deaths of Katricia Daniels and her 10–year–old son, Robert Shepard. Thompson was found guilty by a jury of all four counts and sentenced to two consecutive life terms without the possibility of release. Thompson directly appealed his convictions, claiming the district court erred in admitting certain statements he made to the police and in admitting com-

puter-generated images of the crime scene. He also claims his trial counsel was ineffective, and that consecutive life sentences for a 17–year–old constitute cruel and unusual punishment. We affirm the convictions.

J.W. lived in an apartment in south Minneapolis, Minnesota, with his fiancée Katricia Daniels and her three young children. At approximately 7:10 a.m. on June 12, 2008, J.W. returned home from working the night shift at his job. He discovered Daniels' body lying in a pool of blood in the bathroom and the body of Shepard in the entrance to the north bedroom of the apartment.

Evidence at the crime scene was extensive and took nearly a week to process. Police observed significant blood and footprints throughout the house, including in the kitchen, bathroom, and southeast bedroom. The door to the bathroom in which Daniels' body was found had been forced open, and the toilet was knocked from its base, likely caused by Daniels bracing herself against it as she tried to keep the bathroom door closed. The walls and ceiling of the bathroom were covered with scrapes and gouges. The bedroom where Shepard was found was strewn with papers, a cabinet was broken into pieces, and a television set was on the floor next to Shepard's body.

The Hennepin County Medical Examiner performed autopsies on both bodies. Shepard suffered both sharp force and blunt force injuries to his head and neck. There was evidence of asphyxia. The cause of death was complex homicidal violence. Based on the lack of defensive wounds, the State argued at trial that Shepard was held by one person and killed by another.

Daniels suffered many sharp force injuries to her head, neck, torso, arms, and hands. She suffered approximately 193 stab wounds. She had injuries to her hand and arm areas that were consistent with defensive wounds. The likely cause of death was blood loss that resulted from the stab wounds.

Daniels' neighbor discovered a right-handed bloody black work glove and a pair of rubber gloves in the garbage can behind her house. A bloody knife was also found in a garbage can of a neighboring home. Daniels' cell phone was found inside a garbage can two blocks from the crime scene.

According to phone records, the last call made from Daniels' cell phone was to the cell phone of Tiffany Simmons. The police interviewed Simmons on June 13, 2008, and learned that she was Thompson's girlfriend. She told police that on the night of the murders she was with Thompson and Brian Flowers. Flowers needed a place to stay and Thompson suggested he stay at Daniels' apartment. Thompson was 17 years old at the time. Simmons dropped Thompson and Flowers off at Daniels' apartment at approximately 10 p.m. Thompson and Flowers were both wearing hooded sweatshirts and dark clothing.

Thompson was well acquainted with the victims. He frequently visited J.W. and Daniels in their apartment and spent time with the children. According to J.W., Thompson treated Shepard as a younger brother. Thompson called Daniels "mom" and was protective of her. Daniels treated Thompson like she treated her own children; Thompson considered Daniels' apartment to be a second home.

After dropping Thompson and Flowers off, Simmons received a call from Thompson from Daniels' cell phone, informing Simmons that he would not be able to call her again until the morning. Simmons was surprised when at 3 a.m. she received two phone calls from Thompson from his uncle's cell phone asking Simmons to pick

Thompson and Flowers up. His uncle lived just two blocks from Daniels' apartment.

Simmons picked up Thompson and Flowers in the alley behind the uncle's house. Flowers rode in the back seat and remained quiet. They drove to Simmons' apartment where Simmons observed that Thompson had blood on his boxer shorts and cuts on his hands. Thompson showered, leaving his bloody clothes on Simmons' floor. Simmons later placed the bloody clothes in a bag and Thompson disposed of the bag in a trash can in the alley behind Simmons' apartment.

Thompson and Flowers told Simmons that they were on the porch of Daniels' apartment when several men walked past and started an argument. Daniels came outside and broke it up, but later there was a loud banging at the back door, and the same group of men rushed in the front door with knives. Thompson and Flowers escaped out of the apartment and ran to the home of Thompson's uncle and then called Simmons.

Simmons cooperated with the police in having Thompson and Flowers contact the police investigators. On June 13, 2008, in response to a call from Thompson, the investigators met with Flowers, Simmons, and Thompson at the home of Flowers' mother. After arriving at the home, the investigators asked the three to be interviewed at the Homicide Division at City Hall. Simmons then drove all three to City Hall where they were separately interviewed. Based on evidence obtained through the statements, Thompson and Flowers were placed under arrest.

At trial, the State presented considerable forensic evidence. The knife found in the garbage can of a neighboring home and a knife blade, knife handle, and golf club found in the hallway were all covered with Daniels' blood. In the bathroom, three latent prints in blood were found— two left palm prints and one left middle fingerprint—all of which were attributable to Thompson. DNA found under Daniels' fingernails matched Thompson's DNA. DNA evidence established that Thompson's clothes (found bagged in a garbage can in the alley behind Simmons' apartment) were covered with Daniels' blood. Thompson's socks, which were found in a tree near an Interstate 35W ramp a block from Daniels' apartment, contained Daniels' blood. Thompson's shoes taken from his mother's house had Daniels' blood on the inside. A knife found hidden in a box in a garbage can near Daniels' apartment had the blood of both victims on the blade, and Thompson's DNA could not be excluded from DNA found on the handle of the knife.

The right-handed black work glove found in a neighbor's garbage can was saturated with Daniels' blood. The glove had a defect or a cut in the area between the thumb and index finger. Photos of cuts on Thompson's hands showed various small cuts on both hands and a significant cut to the webbing between the thumb and the index finger of Thompson's right hand.

The State also presented evidence of bloody footprints and shoeprints found in various locations in the house. Multiple shoeprints from the house matched the tread on Nike tennis shoes that belonged to Flowers. None of the prints matched Thompson's red-and-black shoes. There were multiple footprints made by a person wearing socks.

Thompson's attorney admitted at trial that Thompson was present during the murders, but claimed that Flowers committed the murders and acted alone. Thompson said in statements to the police that he was shocked by Flowers' behavior and that he was threatened by Flowers to

remain quiet. He explained Daniels' blood on his clothes by asserting that he tried to comfort her as she was dying.

The jury found Thompson guilty on all counts, and the district court sentenced him to two consecutive life terms without the possibility of release. Thompson appealed to this court, claiming that (1) the district court erred in admitting his statements made to police; (2) the district court erred in admitting the State's computer-generated images of shoeprints and footprints found at the crime scene; (3) his trial counsel was ineffective; and (4) consecutive life sentences without the possibility of release for a 17–year–old constitute cruel and unusual punishment.

## I.

■ Thompson first challenges the district court's admission of his four recorded statements. We accept a district court's findings of fact regarding the giving of a statement unless those findings are clearly erroneous. *State v. Wiernasz,* 584 N.W.2d 1, 3 (Minn.1998); *State v. Williams,* 535 N.W.2d 277, 286 (Minn. 1995). However, we will make an independent determination of whether a suspect was in custody, *State v. Staats,* 658 N.W.2d 207, 211 (Minn.2003), whether the State has shown by a fair preponderance of the evidence that a defendant knowingly, intelligently, and voluntarily waived his rights, *State v. Jones,* 566 N.W.2d 317, 324 (Minn. 1997), and whether a statement was given voluntarily, *State v. Riley,* 568 N.W.2d 518, 525 (Minn.1997). If we conclude that the district court erroneously admitted a statement, we then determine whether the error was harmless beyond a reasonable doubt, meaning the verdict was "surely unattributable" to that error. *State v. Bailey,* 677 N.W.2d 380, 392 (Minn.2004) (citation omitted) (internal quotation marks omitted).

### A. First Statement

■ Thompson made his first statement after he arrived at the police station. He claims that he was in custody when he gave the statement, and argues that because he was not given a *Miranda* warning before he gave the statement, the statement should have been suppressed. Statements made by a suspect during a "custodial interrogation" are admissible only if the statement was preceded by a *Miranda* warning. *Miranda v. Arizona,* 384 U.S. 436, 444–45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *State v. Edrozo,* 578 N.W.2d 719, 724 (Minn.1998). Thus, a *Miranda* warning is required if a suspect is both in custody and subject to interrogation. *See Edrozo,* 578 N.W.2d at 724. An interrogation is custodial if, based on all the surrounding circumstances, "a reasonable person under the circumstances would believe that he or she was in police custody of the degree associated with formal arrest." *State v. Champion,* 533 N.W.2d 40, 43 (Minn.1995); *accord Staats,* 658 N.W.2d at 211.

■ While no factor alone is determinative, we have identified several factors that may combine to indicate a suspect is in custody: "police interviewing the suspect at the police station; the officer telling the individual that he or she is the prime suspect; officers restraining the suspect's freedom; the suspect making a significantly incriminating statement; the presence of multiple officers (six); and a gun pointing at the suspect." *Staats,* 658 N.W.2d at 211. We have also identified factors that may indicate a suspect is not in custody:

> questioning taking place in the suspect's home; police expressly informing the suspect that he or she is not under arrest; the suspect leaving the police station at the close of the interview

without hindrance; the brevity of questioning (fifteen minutes); the suspect's freedom to leave at any time; a non-threatening environment; and the suspect's ability to make phone calls. *Id.* at 212.

■ The district court found that events leading up to Thompson's first statement indicate that he was not in custody when he gave that statement. Thompson voluntarily telephoned investigators, invited them to Flowers' residence, and followed them to the police station. The investigators were in an unmarked car and were not in uniform. There was no evidence that weapons or force were used to bring Thompson to the police station. At the station, Thompson was placed in a room with the door open and unlocked and was told that he was not under arrest and was free to go. The interview was not coercive and Thompson never admitted guilt. The district court applied the *Staats* factors to these findings and concluded that "[a] reasonable person in [Thompson's] position[ ] would not have believed that he or she was in custody to a degree associated with arrest." We agree.

We have found interrogations to be noncustodial under similar circumstances. *See, e.g., Wiernasz,* 584 N.W.2d at 1, 5 (interrogation held noncustodial because defendant voluntarily came to the police station, was told by police that she was not under arrest and, at the close of the interview, was allowed to leave without hindrance despite the fact that she was a prime suspect, was confronted with inadmissible evidence, and confessed); *Champion,* 533 N.W.2d at 42 (initial interrogation of a suspect was held noncustodial because suspect voluntarily came with the officer to the station and because he was permitted to take unescorted cigarette, bathroom, and water breaks, was interviewed in a room at the station with the

door closed, and ultimately confessed an hour into the interview, resulting in his arrest). Thus, even though Thompson was interviewed at the police station, he voluntarily came to the station for the interview, was told he was not under arrest, was free to leave, was provided water, did not confess, and was not arrested immediately following the initial interview. We hold, based on our independent review of the facts, that a person in Thompson's circumstance would not have reasonably believed he or she was in custody to the degree associated with a formal arrest, and thus the district court did not err in admitting Thompson's first statement.

### B. Second Statement

■ The second statement was recorded after Thompson was placed under arrest, given a *Miranda* warning, and allowed to telephone his mother. He challenges the district court's admission of his second statement on the ground that he did not voluntarily waive his *Miranda* rights. "If police fully advise an accused of his or her *Miranda* rights and the accused indicates that he or she understands the rights but nevertheless gives an incriminating statement, the state is deemed to have met its burden of proving that the accused *knowingly* and *intelligently* waived his or her rights." *State v. Jones,* 566 N.W.2d 317, 322 (Minn.1997). Whether a statement is involuntary within the meaning of the Due Process Clause of the Fourteenth Amendment necessitates a finding that the statement was coerced. *State v. Riley,* 568 N.W.2d 518, 525 (Minn. 1997). The key question is whether the will of the defendant was overborne, which does not necessarily require threats or intimidating techniques. *Id.* To determine if a juvenile voluntarily waived his rights, "a court must further evaluate the totality of the circumstances" by consider-

ing factors such as "the juvenile's age, maturity, intelligence, education and prior criminal experience, as well as any physical deprivations during the interrogation, the presence or absence of parents, the length and legality of the detention, the lack of or adequacy of warnings, and the nature of the interrogation." *Jones*, 566 N.W.2d at 322–23.

■ The district court's findings of fact regarding Thompson's second statement are uncontested and supported by the record. After Thompson's initial 40–minute interview and a 3–hour wait, he was placed under arrest. Thompson immediately requested to speak to his mother, and he was provided with a phone to do so. After confirming that his mother was on her way to the station, the officers proceeded to read Thompson his "enhanced" *Miranda* warnings, a process whereby the officer stated each of Thompson's rights and asked Thompson to explain those rights in his own words. When the officers asked Thompson if he wanted to talk to them without his mother, Thompson spontaneously spoke to the officers. He informed them of his presence during the murders, but claimed Flowers did the killing. He also repeated his story of gang members breaking into the apartment.

■ Thompson highlights several factors in support of his claim that his waiver and statement were not voluntary. First, he asserts that his mother should have been present because he "wanted her trusted counsel" before speaking. However, we have rejected a per se rule requiring parental presence during a juvenile's interrogation. *State v. Burrell*, 697 N.W.2d 579, 592–93 (Minn.2005) (adopting a totality of the circumstances test). Therefore, the absence of Thompson's mother is not dispositive and is merely one factor in determining whether Thompson voluntarily waived his *Miranda* rights.

Next, Thompson claims that the warnings were inadequate because he was not informed that the statement could be used in an adult prosecution. We have declined to adopt a requirement that a juvenile be specifically informed that any statement could be used against him in adult court. *See, e.g.*, *Burrell*, 697 N.W.2d at 592 (imputing knowledge of adult court prosecution on 16–year–old because he was arrested by police officers and knew he was apprehended in connection with a murder). Finally, Thompson argues that his statement was not voluntary because he never explicitly waived his rights. But the failure to explicitly waive a right is not dispositive where it is apparent the statement was freely given. As noted in *Jones*, the State meets its burden of proving a waiver by merely showing a defendant was advised of his rights and then began to speak freely to the investigator. 566 N.W.2d at 322.

The totality of the circumstances indicates that Thompson's waiver and statement were voluntary. He was 17 years old, had some high school education, had waived his *Miranda* rights on two prior occasions, and was able to explain in his own words each of his rights. Furthermore, he was permitted to call his mother and knew she was on her way to the police station when he proceeded to speak with the investigators. As the district court recognized, "[n]o improper or unfair police tactics induced Thompson to give up his *Miranda* rights" and give his second statement.

Based on an independent review of the facts, we hold that Thompson voluntarily waived his *Miranda* rights and voluntarily made the second statement. The district court did not err in admitting the second statement.

### C. Third Statement

Thompson next challenges the admission into evidence of the recording of his conversation with his mother and brother on grounds that it violated: (a) Minnesota's parent-child privilege, Minn. Stat. § 595.02, subd. 1(j) (2008); (b) Minnesota's prohibition against intercepting oral communications without authorization, Minn.Stat. § 626A.02 (2008); and (c) his Fourth Amendment right to be free from unreasonable searches. During this conversation, Thompson again admitted his presence at the time of the murders and claimed Flowers threatened him to keep quiet. The remainder of the recording was Thompson's mother and brother urging him to tell the truth to the investigators. Thompson's statement did not reveal any new inculpatory information and was mentioned only briefly by the State in its closing argument. On these facts, any error in admitting the recording was harmless beyond a reasonable doubt. We therefore decline to address whether the third statement was admissible.

### D. Fourth Statement

We turn to Thompson's fourth statement, given to investigators in the presence of Thompson's mother and brother. In this statement, Thompson acknowledged being at the crime scene but never admitted culpability. He claims the statement should have been suppressed because it was "tainted" by the previous unlawfully obtained statements and was not voluntarily given. Thompson argues that the statement was not voluntary because he had been detained for over 5 hours, was without food, was panicked at the prospect of his family leaving, and the investigators exerted coercive force on him by capitalizing on knowledge gained from wrongfully monitoring his conversation with his family.

As noted earlier, whether a statement is involuntarily given requires a finding that the statement was coerced. State v. Riley, 568 N.W.2d 518, 525 (Minn.1997). We review the same factors used to analyze Thompson's second statement, including age, maturity, intelligence, education, experience, ability to comprehend, lack of or adequacy of warnings, length and legality of detention, nature of interrogation, physical deprivations, and limits on access to counsel and friends. State v. Jones, 566 N.W.2d 317, 322–23 (Minn.1997).

Thompson was 17 years old, had some high school education, had waived his Miranda rights on two prior occasions, and was able to explain each of his rights. Further, for this statement, his mother and brother were present. His mother specifically asked him, "[D]o you not want to talk anymore, or no, or what?" Thompson responded, "Yeah, I do." His mother responded, "Okay," and Thompson asked "Why wouldn't I?" Additionally, even if we assume that the investigators had earlier wrongfully monitored Thompson's conversation with his mother and brother, the investigators did not use that knowledge to obtain an involuntary statement. The officers did not use knowledge gained during the monitored conversation to coerce Thompson into making the fourth statement. In fact, the monitored conversation did not contain any information that had not already been given during his first or second statements. There is no evidence that Thompson's will was overborne during the interview; he did not confess to the murders and merely admitted his presence at the crime scene. Based on the totality of the circumstances, the district court did not err in declining to suppress the statement.

### II.

Thompson next challenges the admission of a series of computer-generated

images[1] depicting bloody footprints and shoeprints at the crime scene. Thompson objected to the images as unnecessary and prejudicial. He asserts that the images embellished the actual prints by depicting "well-defined foot or shoeprints" where the crime scene photos show "a muddled mess with a few clearly distinguishable footprints."

 Computer-generated animation is admissible if it "is relevant and accurate and assists the jury in understanding the testimony of a witness." *State v. Stewart,* 643 N.W.2d 281, 293 (Minn.2002). But "[b]ecause of its dramatic power, proposed animations must be carefully scrutinized for proper foundation, relevancy, accuracy, and the potential for undue prejudice." *Id.* at 296. The admission of evidence at trial is within the broad discretion of the district court, and we will not reverse absent a clear abuse of discretion. *Id.* at 292; *State v. Kennedy,* 585 N.W.2d 385, 389 (Minn.1998).

The district court concluded that the images were "helpful for me to understand it and explained the different tracks, how there's two different kinds of impressions and what those tracks are. I have to say that was helpful to me." A comparison of the actual photographs to the computer-generated images makes apparent the helpfulness of the images. Much of the flooring in the house was covered in blood and although it is possible to observe the outlines of what appear to be prints, it is much easier to identify the prints and distinguish between the two types of prints, as Officer Jorgensen testified when viewing the computer-generated images. Therefore, we conclude that the district

court did not err in finding the images helpful.

Thompson asserts that the computer-generated images were prejudicial because the State's case was "improperly bolstered" by the images. Thompson also expresses concern that the red patches displayed on the victims' clothing and on the floor near the victims in the images were unfairly prejudicial.

First, the red coloring on and near the victims reflected the locations of blood found on the victims and, as the district court noted, the computer-generated images were "less gory, for lack of a better word, than using the photos." However, the district court did not make any specific findings as to unfair prejudice created by the footprint and shoeprint images. As noted in *Stewart,* there is a concern that computer-generated images may cause the jury to confuse art with reality and accept the depictions of the expert's testimony as fact. 643 N.W.2d at 296. That concern is not an issue in this case. The manner in which the images were presented offered a basis of comparison between the computer-generated images and actual photographs. Officer Jorgensen first used the computer-generated images to provide the jury with an overview of a particular area of the crime scene, noting the different locations where she observed certain prints. Subsequently, the actual photographs of that area of the crime scene were displayed and she again identified the different areas in which she observed the prints. In presenting the evidence in this manner, the potential for unfair prejudice was minimized. Furthermore, Thompson had the opportunity to, and did, challenge the foot-

1. Although the parties refer to the images as computer-generated animations, they are better categorized as computer-generated images because they are essentially static images "subject to computer-driven manipulation" including highlighting, enlargement, split screen presentation, and zooming. *See 2 McCormick on Evidence* § 214 (Kenneth S. Brown ed., 6th ed.2006).

print and shoeprint patterns and locations using the actual photographs.

We hold that the district court did not abuse its discretion in finding the computer-generated images' helpfulness was not substantially outweighed by any unfair prejudice.

### III.

■■■ Thompson filed a pro se supplemental brief claiming ineffective assistance of trial counsel and that a life sentence for a minor is cruel and unusual punishment. In *State v. Martin* we held that a life sentence without the possibility of release does not violate the prohibition of cruel and unusual punishment under the Federal and State Constitutions. 773 N.W.2d 89, 97–98 (Minn.2009) (declining to overturn precedent because defendant failed to show a compelling reason to do so); *see State v. Chambers*, 589 N.W.2d 466, 479–80 (Minn.1999) (holding that as applied to a 17–year–old convicted of murdering a peace officer, life in prison without the possibility of release does not constitute cruel or unusual punishment). Thompson's sentence of two consecutive life terms without the possibility of release for a double homicide does not constitute cruel or unusual punishment.

■■■ Thompson alleges that he received ineffective assistance of counsel because his counsel failed to interview certain witnesses, declined to administer and admit a polygraph test, and withheld information from the jury that could have changed the outcome of trial. Because these claims are based essentially on trial strategy, we need not review them. *See Williams v. State*, 764 N.W.2d 21, 31 (Minn.2009) (stating that we will not review ineffective-assistance-of-counsel claims based on trial strategy unless they implicate a fundamental right). Moreover, even if counsel had complied with Thompson's request for a polygraph test, the results would have been inadmissible at trial and therefore would not have affected the outcome. *See State v. Riley*, 568 N.W.2d 518, 527 (Minn. 1997).

Thompson further claims that his counsel chose a biased juror. A thorough review of voir dire reveals no action on the part of trial counsel falling below an "objective standard of reasonableness." *See Francis v. State*, 729 N.W.2d 584, 592 (Minn.2007) (appellant has the burden to demonstrate that the actions of his counsel fell below an objective standard of reasonableness and that the outcome of trial would have been different had counsel proceeded differently). Thompson failed to meet his burden, and therefore he is not entitled to relief.

Finally, Thompson claims that his counsel did not follow his wishes and that his counsel provided incorrect information to Thompson's mother during trial. He fails to provide any indication of what he asked his trial counsel to do differently or what false information was provided to his mother. His claims are mere allegations and do not entitle him to relief.

Affirmed.

Concurring, PAGE and ANDERSON, PAUL H., JJ.

STRAS, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

PAGE, Justice (concurring).

I concur in the result, but I write separately to note that I would hold that it was error for the trial court to admit into evidence the recording of Thompson's conversation with his mother.

The Fourth Amendment to the United States Constitution and Article I, Section

10, of the Minnesota Constitution protect "[t]he right of the people to be secure in their persons, houses, papers, and effects" against "unreasonable searches and seizures." The Fourth Amendment "protects people, not places." *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). What one "seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Id.* at 351–52, 88 S.Ct. 507. A person's privacy expectation is protected if it is legitimate, meaning the person had "an actual (subjective) expectation of privacy" and, second, the expectation is one "society is prepared to recognize as 'reasonable.'" *Id.* at 361, 88 S.Ct. 507 (Harlan, J., concurring). Electronic eavesdropping may constitute an unreasonable search or seizure. *Lanza v. New York,* 370 U.S. 139, 142, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962).

Here, the police unreasonably intruded on Thompson's privacy by recording his conversation with his mother. The Legislature has specifically recognized a parent-child privilege of confidentiality. As a result, it is improper for the police to invade this privilege. Minn.Stat. § 595.02, subd. 1(j) (2008) ("A parent or the parent's minor child may not be examined as to any communication made in confidence by the minor to the minor's parent. A communication is confidential if made out of the presence of persons not members of the child's immediate family living in the same household."). Further, the Supreme Court has held that even in a jail setting, "the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection." *Lanza,* 370 U.S. at 144, 82 S.Ct. 1218. "Consultation with a parent is meaningless if the police may surreptitiously record the conversation between the parent and child and the prosecutor may then play the recording to the jury." *Dickerson v. State,* 292 Ga.App. 775, 666 S.E.2d 43, 48 (2008) (Barnes, C.J., concurring specially). Just as we would not allow "the recording of a conversation between a defendant and his attorney, we should not permit the recording of a conversation between a juvenile defendant and his parent." *Id.; cf. People v. Harrell,* 87 A.D.2d 21, 450 N.Y.S.2d 501, 505 (N.Y.App.Div.1982) (concluding that a 17–year–old defendant's statement to his mother should have been suppressed when he was not afforded privacy or given appropriate warnings), *aff'd mem.,* 59 N.Y.2d 620, 463 N.Y.S.2d 185, 449 N.E.2d 1263 (1983).

Thus, I would conclude that the police improperly recorded the conversation between Thompson and his mother and that admitting evidence of that conversation at trial was error. While I believe that the admission of such evidence was in error, I concur in the result as the error in admitting that evidence was harmless beyond a reasonable doubt.

ANDERSON, PAUL H., Justice (concurring).

I join in the concurrence of Justice Page.