*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0750**

State of Minnesota,
Respondent,

vs.

Terry Gordon Wurtz,
Appellant.

**Filed November 16, 2015
Affirmed
Rodenberg, Judge**

Cottonwood County District Court
File No. 17-CR-13-471

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Nicholas A. Anderson, Cottonwood County Attorney, Lori A. Buchheim, Assistant County Attorney, Windom, Minnesota (for respondent)

Ryan M. Pacyga, Murad M. Mohammad, Derek W. Hansen, Anthony M. Bussa, Ryan Pacyga Criminal Defense, Minneapolis, Minnesota (for appellant)

        Considered and decided by Halbrooks, Presiding Judge; Rodenberg, Judge; and

Stoneburner, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**RODENBERG**, Judge

On appeal from his hunting-while-under-the-influence-of-alcohol conviction, appellant Terry Gordon Wurtz argues that the conservation officer (1) lacked reasonable, articulable suspicion to expand the stop, and (2) conducted an impermissible custodial interrogation of appellant. We affirm.

## FACTS

On October 12, 2013 at approximately 6:15 p.m., Conservation Officer Jason Beckmann of the Minnesota Department of Natural Resources was working near the Hurricane Lake Wildlife Management Area (WMA) in Cottonwood County. While he was at the entryway to the WMA, Officer Beckmann noticed a car parked in a legal parking area. Officer Beckmann testified that, in accordance with his usual practice, he parked his truck near the empty car and waited for the hunters to return so he could check their licenses and equipment.

Officer Beckmann noted that the closing time for hunting waterfowl and pheasants was at 6:42 p.m. that day. At 6:45 p.m., Officer Beckmann heard two gunshots. After hearing the gunshots, Officer Beckmann continued to wait near the hunters' vehicle for them to return. When the hunters returned, Officer Beckmann asked them about the hunt and the weather and checked the three men's guns and licenses.

Once the men were close to Officer Beckmann, he noticed the odor of an alcoholic beverage. He also noticed that S.F. had empty, partially crushed beer cans in the front pouch of his jacket. While speaking with the group, Officer Beckmann noted that E.B.

2

smelled strongly of an alcoholic beverage, his eyes were glassy, and his speech was slurred. Officer Beckmann smelled a moderate odor coming from S.F. and that S.F. appeared to be tired, with droopy eyelids. In his report, Officer Beckmann noted that he was not initially able to smell an odor of an alcoholic beverage coming from appellant. But Officer Beckmann "thought there was a strong likelihood that one or all of them could have been hunting under the influence" when he was talking to the group because, despite the windy conditions, he could easily smell the odor of alcoholic beverages coming from the group.

Once Officer Beckmann completed checking the licenses and guns of the three men, he explained to them that hunting after hours was prohibited. He then explained to them that he could smell an odor of alcohol coming from them and asked whether the threesome had been drinking, and all three responded that they had been drinking. Appellant admitted drinking approximately two beers before going hunting.

After receiving confirmation from all three men that they had been drinking, Officer Beckmann advised the group that he wanted to speak with them individually and perform field-sobriety testing to better determine their level of intoxication. As he began his questioning of E.B., Officer Beckmann radioed the sheriff's office to send a deputy to assist him. Officer Beckmann then subjected E.B. to field sobriety tests. He observed indicia of intoxication, including a preliminary breath test (PBT) with a result of .147. Officer Beckmann then did the same with S.F., whose PBT showed an alcohol concentration of .182. A second law enforcement officer arrived during the examination of S.F.

After testing S.F., Officer Beckmann spoke with appellant away from the other two men. At that point, Officer Beckmann was able to smell a moderate odor of an alcoholic beverage coming from appellant. Officer Beckmann asked appellant to submit to field-sobriety testing. Appellant claimed previous injuries that he thought would prevent him from doing the field-sobriety testing. Officer Beckmann then asked appellant to submit to a PBT. Appellant agreed, and his PBT result was .114.

Officer Beckmann then advised the group that they were all under arrest and would need to go to Windom for further testing. None of the three wanted to go to Windom. Based on the time of night and length of the investigation, Officer Beckmann determined that the hunters could submit to a urine test at the scene. Officer Beckmann then individually read the hunting-while-intoxicated advisory to each man, and each agreed to provide a urine sample without contacting an attorney. After reading the men the advisories, Officer Beckmann read the *Miranda* warning to them and asked them to give statements. All three, including appellant, agreed to speak with Officer Beckmann. Appellant then admitted to drinking six or seven beers throughout the day.

The state charged appellant with hunting while under the influence in violation of Minn. Stat. § 97B.065, subd. 1(a) (2012). Appellant moved to suppress evidence and to dismiss the charge, based on the arguments he advances on appeal. Following an omnibus hearing, the district court denied appellant's motions. Appellant then waived his right to a jury trial, and the parties proceeded under Minn. R. Crim. P. 26.01, subd. 4 (2012). The district court found appellant guilty. This appeal followed.

4

**D E C I S I O N**

Appellant challenges the district court's denial of his pretrial suppression motion, arguing that the officer (1) lacked reasonable, articulable suspicion to expand the stop, and (2) conducted an impermissible custodial interrogation of appellant. He asks us to reverse the district court's pretrial ruling, suppress the urine tests results, and reverse the conviction. When parties stipulate to the facts, we review de novo the district court's determination of whether reasonable suspicion of criminal activity exists to expand the stop, *State v. Diede*, 795 N.W.2d 836, 843 (Minn. 2011), and of whether a person was in custody for *Miranda* purposes. *State v. Scruggs*, 822 N.W.2d 631, 637 (Minn. 2012).

## I. Reasonable, articulable suspicion to expand the stop

Appellant first argues that the district court erred in concluding that Officer Beckmann had reasonable, articulable suspicion to expand the scope of the initial stop and to investigate specifically whether appellant was intoxicated.

Although a stop may be valid initially, the actions of the police during the stop must be "reasonably related to and justified by the circumstances that gave rise to the stop in the first place." *State v. Askerooth*, 681 N.W.2d, 353, 364 (Minn. 2004) (citing *Terry v. Ohio*, 392 U.S. 1, 19-20, 88 S. Ct. 1868, 1879 (1968)) (other citations omitted). "To be reasonable, the basis must satisfy an objective test: would the facts available to the officer at the moment of the seizure . . . warrant a man of reasonable caution in the belief that the action taken was appropriate." *Id.* at 364-65 (citations omitted).

Investigation of any offense beyond that which rendered the initiation of the stop permissible "must be justified by reasonable articulable suspicion of other criminal

5

activity." *State v. Fort*, 660 N.W.2d 415, 419 (Minn. 2003). Although "[t]he reasonable suspicion standard is not high[,] . . . [a] hunch, without additional objectively articulable facts, cannot provide the basis for an investigatory stop." *Diede*, 795 N.W.2d at 843 (quotations omitted). In determining whether there is reasonable, articulable suspicion to expand a stop, we consider the totality of the circumstances, "includ[ing] the officer's general knowledge and experience, the officer's personal observations, information the officer has received from other sources, the nature of the offense suspected, the time, the location, and anything else that is relevant." *Appelgate v. Comm'r of Pub. Safety*, 402 N.W.2d 106, 108 (Minn. 1987). Appellant concedes that the initial stop was valid, but argues that Officer Beckmann's inquiries concerning alcohol consumption to the group, and later to him individually, impermissibly expanded the scope of the stop.

In support of his arguments, appellant cites multiple Minnesota cases holding that a person's nervous behavior alone does not create reasonable, articulable suspicion to expand a stop. In *State v. Burbach*, the Minnesota Supreme Court held that the officer's expansion of a traffic stop into a request to search for drugs was unconstitutional because, apart from nervous behavior and an unsubstantiated tip, the defendant showed no signs of impairment. 706 N.W.2d 484, 490 (Minn. 2005). In *Fort*, the supreme court held that the defendant's nervousness and avoidance of eye contact did not support expansion of a traffic stop into a pat-down search. 660 N.W.2d at 417. In *State v. Wiegand*, the supreme court held that a request for consent to search and use of a K-9 unit was an unlawful expansion of a stop when the defendant appeared somewhat nervous, had glossy

6

eyes, and the officer did not suspect that the defendant was intoxicated. 645 N.W.2d 125, 128-29, 136-37 (Minn. 2002).

Here, Officer Beckmann observed more than mere nervousness from the three hunters with whom he was speaking. He asked the group about alcohol consumption only after he made observations leading to his reasonable, articulable suspicion of their consumption of alcohol. As the group approached Officer Beckmann, he was able to see empty, crushed beer cans in S.F.'s shirt pouch. While he was checking each man's equipment and licenses, Officer Beckmann could smell an odor of an alcoholic beverage coming from the group, even in windy conditions. Officer Beckmann initially observed that E.B. had glassy, watery eyes and slightly slurred speech, and that S.F.'s eyes appeared droopy and tired. Based on these observations, Officer Beckmann began to suspect during this initial conversation that "there was a strong likelihood that one, or all of them, could have been hunting under the influence." Those observations support the district court's factual finding that, at that point, Officer Beckmann could not specifically identify an odor of alcohol coming from appellant but also could not confirm that the odor of alcohol was not coming from him. After these observations, Officer Beckmann asked the group whether and how much they had been drinking, and all three men admitted that they had been consuming alcohol.

The facts, including Officer Beckmann's inability to precisely identify the source of the odor of alcohol, gave the officer reasonable, articulable suspicion that one or more of the hunters was intoxicated. Therefore, asking the group whether and how much they had been drinking to determine whether any or all of them were under the influence of

7

alcohol was lawful. Once appellant acknowledged he had consumed two beers before hunting, it was also reasonable and appropriate to expand the investigation to include asking appellant to perform field-sobriety tests. The expansion of the stop was limited to this purpose. The district court did not err in concluding that Officer Beckmann had reasonable, articulable suspicion sufficient to expand the scope of the stop.

## II.    *Miranda* **custodial interrogation**

Appellant also argues that the district court erred by concluding that he was not in custody for *Miranda* purposes at the time he admitted in response to questions that he had consumed six or seven beers while hunting.

A statement produced by a custodial interrogation is inadmissible unless the suspect is first advised of certain constitutional rights, including the Fifth Amendment right against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966); *State v. Tibiatowski*, 590 N.W.2d 305, 308 (Minn. 1999). A person is in custody for *Miranda* purposes when there has been a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Minnesota v. Murphy*, 465 U.S. 420, 430, 104 S. Ct. 1136, 1144 (1984) (quotation omitted). We apply an objective standard to determine whether, "based on all the surrounding circumstances, a reasonable person under the circumstances would believe that he or she was in police custody of the degree associated with formal arrest." *State v. Thompson*, 788 N.W.2d 485, 491 (Minn. 2010) (quotation omitted). But general on-scene questions such as "Have you been drinking?" and "How much?" do not convert a detention into an arrest, and therefore, do not trigger the need for a *Miranda* warning. *State v. Kline*, 351 N.W.2d

8

388, 390 (Minn. App. 1984). And law-enforcement officers are not required to give *Miranda* warnings to individuals temporarily detained pursuant to brief investigations of criminal activity justified by reasonable suspicion. *Berkemer v. McCarthy*, 468 U.S. 420, 440 (1984); *State v. Herem*, 384 N.W.2d 880, 883 (Minn. 1986).

In *State v. Staats*, the Minnesota Supreme Court noted several factors that may combine to create a custodial situation: the police interviewing the suspect at the police station; the police telling the suspect that he or she is the prime suspect; the police restraining the suspect's freedom; the suspect making a significantly incriminating statement; the presence of multiple police officers; and a gun pointing at the suspect. 658 N.W.2d 207, 211 (Minn. 2003). The supreme court also noted factors tending to weigh against a finding of a custodial situation: questioning taking place in the suspect's home; the police expressly informing the suspect that he or she is not under arrest; the brevity of questioning; the suspect's freedom to leave at any time; a nonthreatening environment; and the suspect's ability to make phone calls. *Id.* at 212.

Here, considering the totality of the circumstances, appellant was not in custody during his conversation with Officer Beckmann. Most significantly, Officer Beckmann's inquiry to the group about alcohol consumption was a general on-scene question. Officer Beckmann, acting on reasonable suspicion of criminal activity, was conducting a brief investigation as part of his ordinary duties as a conservation officer to determine whether any or all of the hunters were intoxicated.

The *Staats* factors also support the conclusion that "a reasonable person under the circumstances would [not] believe that he or she was in police custody of the degree

9

associated with formal arrest." *Thompson*, 788 N.W.2d at 491 (citing *State v. Champion*, 533 N.W.2d 40, 43 (Minn. 1995)). Appellant was standing in the public WMA parking lot. Officer Beckmann was alone, talking with three armed men. Officer Beckmann never drew his weapon or handcuffed the men. And Officer Beckmann was professional and courteous, exchanging pleasantries with the men about their hunting experience and the weather.

Appellant argues that Officer Beckmann's not having instructed appellant that he could leave shows that he was in custody. But the custody determination does not turn on "merely whether a reasonable person would believe he or she was not free to leave." *Scruggs*, 822 N.W.2d at 637. Instead, "an interrogation is custodial if, based on all the surrounding circumstances, a reasonable person would believe he or she was in police custody *to the degree associated with formal arrest*." *Id.* (emphasis added). Only one relevant factor suggests that appellant was in custody: that he made significantly incriminating statements.

The district court did not err in concluding that appellant was not in custody for the purposes of *Miranda*. It therefore properly denied the motion to suppress and dismiss.

**Affirmed.**