OPINION OF THE COURT
Titone, J.
On March 15, 1987, Olga Estremera was killed in defendant’s apartment. Following that slaying, defendant fled to Miami, Florida, where he confessed to police after consulting with two clergymen. The issue in this appeal from the affirmance of defendant’s homicide conviction is whether the inculpatory contents of his conversations with the clergymen were properly admitted against him at trial. Resolution of this issue requires consideration of whether those conversations *606 were privileged under CPLR 4505 and, if so, whether the courts below properly concluded that defendant’s privilege had been waived when defendant, who was by then the subject of an outstanding bench warrant, turned himself in and, in essence, told the authorities what he had told the two clergymen.
I.
The privilege question was considered in limine during defendant’s pretrial Mapp-Huntley-Wade hearing. At that time, Detective Julio Torres, the Miami officer who took defendant’s confession, testified that the police had been contacted by a Reverend Hernandez, who stated that he was with someone who wanted to confess to a New York murder. While one officer went to pick that individual up, Torres discovered that the person in question was the subject of an arrest warrant in New York that had been issued in connection with the Estremera homicide.
When defendant arrived at the Miami police station, Torres administered Miranda warnings and, after obtaining "waivers” of defendant’s Miranda rights, elicited a detailed statement about how defendant had strangled Estremera in New York and had then fled the jurisdiction. Torres testified that, during his interview with defendant, defendant told him that he had given the same inculpatory information to Reverend Hernandez and one of Hernandez’s associates, Reverend Mimoso. By stipulation, Torres was permitted to read his police report into the record.
Torres’s report recounted an interview between Torres and William Jaramillo, who had met defendant and spoken with him shortly after defendant had arrived at the bus terminal in Miami. The report stated:
"[Defendant] told [Jaramillo] * * * that he had a problem[,] * * * that he was a crack dealer and had killed someone. * * * During the time that [defendant] conversed with [Jaramillo], [defendant] cried.
"[Jaramillo] is a member of Rev. Hernandez’s church and while he talked to [defendant], he talked about God. [Defendant] told him that he had grown up in the church and he became involved in dealing drugs when he left the church. [Jaramillo] then referred [defendant] to Pastor Hernandez.”
Torres, who had interviewed Reverends Hernandez and *607 Mimoso, also testified that, according to the two clergymen, defendant had agreed to surrender himself after "they talked to him and * * * convinced him that the right way to do it was to be remorseful about it, and [told him] that if he was going to [be] following the rules of God, * * * the right thing was to turn himself in.” Also admitted were the transcripts of sworn statements by Hernandez and Mimoso, which had been given to Detective Torres when he questioned the two ministers. Hernandez’s statement indicated that he had had a telephone conversation with defendant before meeting him in which defendant stated "that he had a problem and that he needed spiritual help.” According to both Hernandez’s and Mimoso’s statements, defendant first "opened up” to Hernandez when the two men were talking in Hernandez’s garden after Hernandez and Mimoso had taken defendant to a church service. Defendant subsequently told Reverend Mimoso his inculpatory story at Reverend Hernandez’s urging.
A sworn statement given by defendant to Detective Torres on the day he surrendered was also admitted at the hearing. In this statement, defendant described how he had decided to turn himself in because the "reverends * * * could not accept [him since he] was not in good standing in their laws.” Defendant further described how he had "prayed and * * * was crying a lot” before he made the final decision.
On the basis of this evidence, the trial court concluded that defendant’s statements to Reverends Hernandez and Mimoso were "of a spiritual and confidential nature, and therefore would initially fall within the ambit of privilege.” However, the court went on to conclude that defendant had waived his privilege by relating the "full content” of the privileged communications, particularly since "defendant advised Detective Torres that his statements were the same subject matter that he had imp[a]rted to the two Reverends.” Accordingly, the statements defendant had made to Reverends Hernandez and Mimoso were admissible, although, as the People conceded, defendant’s statements to Detective Torres, which were made without benefit of counsel, were not (see, People v Samuels, 49 NY2d 218). The court declined to adopt defense counsel’s argument that the violation of his State right to counsel affected the admissibility of his statements to the two ministers. Notably, the People did not argue, here or in the trial court, that the right to counsel analysis should be different because defendant was interrogated by the police in *608 another jurisdiction that does not necessarily follow the Samuels rule.
Defendant was promptly tried and the jury found him guilty of second degree murder. On his appeal, the Appellate Division affirmed after rebuffing defendant’s contention that the trial court had erred in admitting the testimony of Reverends Hernandez and Mimoso in evidence. The Appellate Division agreed with the trial court’s conclusion that although the communications between defendant and the two clergymen were privileged, the privilege had been waived when defendant "voluntarily repealed] the substance” of those communications to the police (186 AD2d 214, 214-215). We now reject the lower courts’ conclusion that in these circumstances defendant’s CPLR 4505 privilege was effectively waived. We nonetheless conclude that the judgment of conviction was properly affirmed because, in view of the virtually air-tight circumstantial evidence of guilt, the error in the admission of the clergymen’s testimony was harmless.
II.
CPLR 4505 provides: "Unless the person confessing or confiding waives the privilege, a clergyman, or other minister of any religion or duly accredited Christian Science practitioner, shall not be allowed to disclose a confession or confidence made to him in his professional character as a spiritual advisor.” Although often referred to as a "priest-penitent” privilege, the statutory privilege is not limited to communications with a particular class of clerics or congregants. Nor is it confined to "penitential admission[s] * * * of a perceived transgression” or avowals made " 'under the cloak of the confessional’ ” (concurring opn, at 623, 624, quoting Matter of Keenan v Gigante, 47 NY2d 160, 166). On the contrary, in enacting CPLR 4505, the Legislature intended to recognize "the urgent need of people to confide in, without fear of reprisal, those entrusted with the pressing task of offering spiritual guidance” (Matter of Keenan v Gigante, supra, at 166) without regard to the religion’s specific beliefs or practices.
While the privilege may have "ha[d] its origins in the Roman Catholic sacrament of Penance, in which a person privately confesses his or her sins to a priest [and t]he priest is enjoined by Church law * * * to maintain the confidentiality of the confession,” the New York statute is intentionally *609 aimed at all religious ministers who perform "significant spiritual counselling which may involve disclosure of sensitive matters” (Alexander, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR 4505, at 683). Indeed, the drafters of the current codification struck the concluding phrase from the predecessor provision, which made the privilege applicable to communications made "in the course of discipline, enjoined by the rules or practice of the religious body to which he belongs” (see, Civ Prac Act § 351), because the phrase was ambiguous and rendered it "doubtful whether the rule applies to any confessions other than those to a Catholic priest” (Second Preliminary Report of Advisory Comm on Prac and Pro, 1958 NY Legis Doc No. 13, at 93). Accordingly, what is more appropriately dubbed the "cleric-congregant” privilege is applicable to ministers of all religions, most of which have no ritual analogous to that of the Catholic confession (see, Alexander, op. cit., at 683). Despite the concurrence’s "four canon” analysis, New York’s test for the privilege’s applicability distills to a single inquiry: whether the communication in question was made in confidence and for the purpose of obtaining spiritual guidance (Matter of Keenan v Gigante, supra, at 166).
Of course, not every communication between a cleric and a congregant will justify application of the privilege. It has been held, for example, that disclosures made to a rabbi for the purpose of obtaining his assistance in securing an attorney and a favorable plea bargain are not privileged under the statute (People v Drelich, 123 AD2d 441). Similarly, no privilege attached where the purported congregant went to a priest to apologize to him in the latter’s secular capacity as a victim and the congregant then solicited the priest’s aid in contacting an attorney (People v Schultz, 161 AD2d 970; see also, Matter of N. & G. Children [Alberto G.J, 176 AD2d 504). The common thread in these cases is that the privilege may not be invoked to enshroud conversations with wholly secular purposes solely because one of the parties to the conversation happened to be a religious minister.
Viewed against these standards, the evidence at defendant’s pretrial hearing was plainly sufficient to support the trial court’s finding, which was impliedly adopted by the Appellate Division, that the conversations between defendant and the two Miami ministers were privileged. As was indicated by Officer Torres’s report, defendant was referred to Reverend Hernandez after talking to William Jaramillo about *610 God and about how he had gotten involved with destructive narcotics only after he had fallen away from his own church. Additionally, Reverend Hernandez’s sworn statement indicated that defendant had specifically agreed to speak with him because defendant "had a problem” and "needed spiritual help.”[1] Hernandez then referred defendant to Mimoso for further consultation.
This evidence suffices to support the trial court’s inference that defendant’s contact with Reverends Hernandez and Mimoso had been Initiated for the purpose of obtaining spiritual guidance and solace. Furthermore, the evidence from defendant’s own sworn statement that he had "prayed and * * * was crying a lot,” had bared his soul only after attending a church service and had discussed his standing under religious laws with the two ministers justifies the inference that their conversations were of a spiritual nature. That defendant waited until he and Reverend Hernandez were alone in the latter’s garden before "opening up” to him and agonized before making the decision to turn himself over to police are factors which the lower courts were entitled to consider in determining that the communications between defendant and the ministers were intended to be confidential. In view of the evidence derived from Detective Torres’s report and the sworn statements of the two ministers as well as defendant himself, the fact that defendant did not give live testimony at the hearing or present evidence of his own is not fatal to his claim that the disputed communications were privileged (see, concurring opn, at 624).[2]
*611 III.
Having concluded that the lower courts did not err in finding that the communications among defendant and Reverends Hernandez and Mimoso were privileged under CPLR 4505, we turn now to the question whether that privilege was waived. Although it is clear that an express waiver is no longer required under the current statute (see, Second Preliminary Report, op. cit, at 92, 93), this Court has not extensively discussed the nature of the conduct required to establish an implied waiver. Here, it is argued that defendant’s conduct in imparting the contents of his conversations with the two ministers to the police constituted such a waiver. Alternatively, it is suggested that such a waiver should be implied at least to the extent that defendant conveyed to the police both the contents of his statements to the two ministers and the fact that he had made those statements to them. We have no occasion to resolve the merits of these arguments, however, since we conclude that, under the circumstances of this case, recognition of any waiver defendant may have made would be inconsistent with the principles and purposes underlying the exclusionary rule.
It is undisputed that a warrant had been issued for defendant’s apprehension in connection with the Estremera slaying and that, accordingly, the indelible right to counsel had attached at the time he surrendered and gave his incriminating statements to the police (see, People v Samuels, supra). It is also undisputed that, as the trial court ruled, these statements were inadmissible, except for impeachment purposes, because they were given without benefit of the advice of counsel.
The People contend that the suppression of defendant’s statements to police does not preclude a determination that defendant effectively waived his CPLR 4505 privilege, even though their claim of waiver was based solely on the suppressed statements. We conclude, however, that the People cannot rely on the suppressed statements to establish a waiver. Since the purported waiver flowed from the same *612 wrong and is conceptually inseparable from the statements that were suppressed as a result of that wrong, it should be denied legal effect to the same extent that the underlying statements are denied recognition as admissible evidence in chief. Any other view would permit the People to do indirectly what they cannot do directly — i.e., make positive use of an official illegal act. Such a "backdoor” use of an illegality would run counter to the underlying purpose of the suppression rule: to deter official misconduct by eliminating any benefit that may flow from it. Accordingly, to the extent that a waiver occurred, it should not have been accorded legal effect, and the testimony of Reverends Hernandez and Mimoso regarding defendant’s confidential inculpatory statements to them should not have been admitted at trial.
IV.
It remains for us to determine whether the error in the admission of the two ministers’ testimony constituted reversible error in the context of this trial. Resolution of that question requires a close look at the trial evidence.
According to that evidence, defendant had been romantically involved with the victim, Olga Estremera, for several months before she was killed. Santos Lopez, a witness for the People, testified that on the day of the murder defendant had told him that he was angry with Estremera because she had stolen some money from him and because she was a "snitch.”
In the early evening hours of March 15, 1987, the day of the crime, Estremera had been seen by two witnesses, Dorothy Stephens and David "Poppy” Hawkins, entering defendant’s apartment, leaving it and then returning. After she entered the apartment for the second time, defendant closed the door and the nearby witnesses heard the door lock being engaged. Shortly thereafter, Stephens heard defendant and Estremera screaming and the sounds of what Stephens believed to be someone being beaten. Hawkins, who was "working” as a lookout for defendant’s drug business at the time, confirmed that the sounds of a melee were emanating from the apartment. When Hawkins knocked on the door, he heard defendant say "Poppy, no more, no more,” a direction that he construed to mean that there was no further need for his services that day. According to Hawkins, the disturbance inside the apartment lasted about 15 minutes. Stephens, who had been standing in front of defendant’s door for at least an *613 hour before the incident, stated that she saw no one beside Estremera enter or leave defendant’s apartment.
After the commotion in the apartment had subsided, Hawkins saw three individuals, Martinez, Lopez and Cruz, separately entering and then leaving defendant’s apartment. Martinez testified that, after hearing defendant say "I am pissed off, I am going to kill someone,” he knocked on defendant’s door, gained admittance to the apartment and promptly ran downstairs when he saw what he thought was blood on defendant’s face. When defendant emerged from the apartment himself, he was seen wearing a long-sleeve pullover shirt and jacket. Another witness, Marvin Barnett, looked through his window, saw defendant exiting his building and watched as defendant came over to his own building. Defendant approached Barnett and demanded money from him. During their conversation, Barnett saw blood on defendant’s hands.
The police were alerted by Estremera’s nephew, who told them that screams and fighting had been heard inside defendant’s apartment. Having entered with the assistance of the building superintendent’s helper at approximately 8:00 p.m., the responding officers saw Estremera’s still warm body, which was tied and wrapped in two blankets. According to the County Medical Examiner, Estremera had been strangled and stabbed.
The People’s trial evidence also included testimony by William Jaramillo, the person who had noticed defendant at the Greyhound bus terminal and had referred him to Reverend Hernandez. According to Jaramillo, defendant volunteered that he had "killed somebody” when Jaramillo approached him to determine whether he needed help or solace.
Defendant testified at trial in his own defense, stating that an individual named William Ramirez had been in his apartment when Estremera arrived. Defendant left when the two began to argue about some money that Ramirez had ostensibly left at Estremera’s house. When he returned some 40 minutes later, Ramirez told defendant that he had strangled Estremera with an electric cord and ordered him to lie down on the body. Later, Ramirez indicated that he intended to lay the blame for the killing on defendant.
Defendant then travelled to his sisters’ homes in Brooklyn and New Jersey, telling each that he had been accused of a slaying in Yonkers — a version of events that his sisters confirmed. He ultimately travelled by bus to Miami, where he *614 met Jaramillo and the Reverends Hernandez and Mimoso. However, he denied telling any of these men that he had killed someone.
The defense also introduced the detailed confession defendant had given to Detective Torres after he had turned himself in to the Miami police. Although the statement had been ruled inadmissible as part of the People’s evidence in chief, the court had made it clear that the statement would be admissible on cross-examination should defendant choose to testify. When questioned by his attorney about the statement, defendant stated that he had been interrogated "harshly” although he was weak and that he had finally given a confession in part because he wanted to sleep and in part because he was afraid that Ramirez would harm his family if he did not take the blame for Estremera’s murder. Defendant’s testimony about his interrogation was contradicted by the People’s rebuttal witness, Detective Torres, who stated that defendant had given no indication of being tired or stressed when he was questioned by the Miami police.
V.
Since the erroneously admitted evidence involved a confession of guilt by the accused, we must perform our harmless error inquiry with particular sensitivity to the fact that confessions are "probably the most probative and damaging evidence” that can be introduced against a defendant (Bruton v United States, 391 US 123, 139 [White, J., dissenting], quoted in Arizona v Fulminante, 499 US 279, 292 [White, J., dissenting]). Even in light of that principle, however, we find no need for reversal in defendant’s case.
The circumstantial evidence furnished by several bystanders established that defendant was in the apartment when Estremera entered it for the last time, that he was there for the duration of the melee, which ended in silence, and that Estremera was not seen alive again. A witness who was immediately outside of defendant’s apartment during the relevant time frame saw no one else enter or leave, and two witnesses testified that they saw blood on defendant’s hands and face. Even without defendant’s confession,[3] this evidence *615 was so damning as to dwarf the significance of the Hernandez and Mimoso testimony. When this evidence is added to the other evidence of defendant’s animosity toward Estremera, his murderous mood, his statement to Jaramillo that he had killed someone, his disguised flight,[4] and his own implausible and internally inconsistent version of events,[5] the basis of the jury’s verdict is clear, and it can fairly be said that the error was harmless regardless of what standard for harmless error is applied (see, People v Crimmins, 36 NY2d 230). This is especially so in light of the fact that defendant’s statements to Hernandez and Mimoso that he had fled New York because he had choked two women with an electric cord were inconsistent with the known facts before the jury. Thus, it is unlikely that the jury gave those statements significant weight. Hence, reversal is not required.
Accordingly, the order of the Appellate Division should be affirmed.

. Contrary to the concurrence’s assertion that Reverends Hernandez’s and Mimoso’s sworn statements were introduced "solely for comparison with Detective Torres’ testimony” (concurring opn, at 624), a subsequent passage in the transcript reveals that they were in fact admitted for the purpose "incorporated into the objective of th[e] hearing” — i.e., the resolution of the privilege and waiver questions. The statements’ use was limited only to the extent that they were not to be "admitted into evidence for the truth of the[ir] content.”

. The concurrence’s reliance on defendant’s trial testimony, specifically his denial that he confessed the murder to the two ministers, is misplaced. First, since that testimony was not part of the hearing evidence and was therefore not before the court when it made its determination, it is not relevant to the correctness of that determination and is not a proper subject for consideration on this appeal (see, People v Dodt, 61 NY2d 408), regardless of which party had the burden of proof on the contested issue (see, concurring opn, at 626). Second, even if defendant’s testimony were somehow relevant, it would not provide a basis for denying his CPLR 4505 privilege, since the availability of a privilege depends not on the contents of the *611 privileged communication but rather on the character of the communication, the relationship between the parties to it and the circumstances under which it was made. Finally, defendant’s decision to take the witness stand and deny having confessed murder to the ministers could well have been a strategic choice made in direct response to the trial court’s ruling that the ministers’ testimony would be admissible. Accordingly, defendant’s trial testimony cannot logically be invoked as a hindsight ground for reevaluating the trial court’s pretrial ruling.

. It cannot be determined whether defendant’s decision to testify and his counsel’s concomitant decision to introduce defendant’s confession to Torres as a preemptive measure were influenced by the trial court’s in *615 limine ruling permitting the use of Reverends Hernandez’s and Mimoso’s testimony. Thus, the confession to Torres should not be considered for purposes of this harmless error analysis.

. There was evidence that defendant had dyed his hair a different color, obtained fake identification and assumed a different name before arriving in Miami.

. On one occasion, defendant stated that he had known the "real” killer, Ramirez, for a month and had shared the keys to his apartment with him. On another occasion, defendant stated that he had just met Ramirez on the day of the murder.