OPINION OF THE COURT
Albert Tomei, J.
The defendant, Paul Harris, stands charged with murder in the second degree (two counts) and criminal possession of a weapon in the fourth degree. Defendant moves to suppress two oral statements. The court conducted an evidentiary hearing on defendant’s motion. Detectives Patrick Crosby and Chris Wright testified for the People. The defense called no witnesses. The court finds the People’s witnesses to be credible. Based on the credible evidence, the court makes the following findings of fact and conclusions of law:
*283 Findings of Fact
On July 6, 2009, three people were injured in a shooting outside of 1605 Fulton Street, an apartment building in Brooklyn. Detective Patrick Crosby, the lead detective, went to the scene that morning and learned that Rasheed Craig had been shot in the back and killed, that David Fuller had a gunshot wound in the stomach, and that Robert Holt had been shot in the buttocks. The front windows appeared to have been shot out and there was a variety of ballistics evidence from a high-powered rifle, a 9 millimeter, and possibly a .45 caliber weapon.
The next morning, July 7, 2009, Detective Crosby spoke with Robert Holt, at the 81st Precinct. Holt said that he had been in his apartment on the second floor on the day of the shooting and heard a commotion going on in the lobby or in front of the building. He looked outside the window, but his view was blocked by trees, so he went down to the lobby to see what was going on. He heard a gunshot, realized he was shot, and ran to Interfaith Hospital. He did not say anything about who did the shooting.
Later that same day, after 4:00 p.m., Detective Crosby and his partner, Detective Roman, met Holt a second time, at his attorney’s office. The detectives wanted to interview Holt a second time because the videotape from the lobby camera showed that he was inside the lobby prior to the shooting. Before any questions were asked, Detective Crosby received a telephone call stating that a Paul Harris was waiting at the precinct to speak with him about the incident. Detective Crosby did not know who Harris was. When the detective told his partner about the contents of the call, Holt volunteered that Harris was his brother. The detectives left the office without interviewing Holt and returned to the 81st Precinct.
At the precinct, Detective Crosby spoke with defendant Harris in the BRAM office. The defendant told the detective that he had been in his apartment with his brother, Holt, when he heard a commotion outside. Holt went outside to see what was going on and the defendant followed a short while later. When he reached the lobby, he heard shots being fired, so he ran upstairs to his grandmother’s apartment and went inside. He said that he later learned that his brother was shot and went with his grandmother to Interfaith Hospital, where they learned that Holt had been treated and released and taken to the 81st Precinct. He said that the deceased victim, Rasheed Craig, was *284 a good friend. During the interview, the defendant was crying and holding his stomach and appeared very upset. The detective took contact information, gave the defendant his card, and let the defendant leave the precinct.
Detective Crosby interviewed the second victim, David Fuller, at Kings County Hospital at approximately 12:10 p.m. on July 8, 2009. Fuller stated that he was trying to get into the lobby, there was a commotion, he was shot, and then taken to the hospital. He did not say who shot him.
Detective Chris Wright and Detective Crosby had known each other for 16 years from their work. They were working in different commands in 2009 and Detective Wright was not assigned to assist in the investigation into this shooting incident. Detective Wright had been a deacon at the Christ Memorial Church, an Apostolic church, for 14 years. The defendant’s aunt, Regina Johnson, was a member of the church and an usher. Both defendant and his brother, Holt, had attended the church occasionally, but were not members. The defendant had participated in church youth activities when he was younger.
The church had one pastor, who was in charge and who ordained the deacons and others, and several ministers, elders and ushers. It was the ministers’ function to preach, to counsel and to witness to people. However, any parishioner could come to anyone in the church in a position of authority to talk about spiritual matters. As a deacon, the detective was responsible for the music department, building maintenance, and planning trips and events. He also played a part in services and in some of the youth activities. Although church members sometimes spoke with him about small personal matters, it was not his function in the church for others to talk to him about sins they had committed and to look to him for guidance. A minister would usually play that role.
On July 8, 2009, at 7:00 p.m., Detective Wright was at the church for a prayer service also attended by Holt and his aunt, Johnson. Holt asked to speak to the detective. They spoke alone in a room at the back of the church. Holt said that a guy named Hap had a fight with a guy named Castro, who was the boyfriend of Holt’s baby’s mother. Hap and Castro had two fights that day; the first was without weapons, but the second involved gunshots. Holt was grazed by a bullet in the buttocks during the latter fight. He said that he had spoken to Detective Crosby about the incident and that he was willing to speak to the detective, but the detective was harassing him. Detective *285 Wright told Holt that he had known Detective Crosby for years and that Detective Crosby was a nice guy. Detective Wright offered to speak to Detective Crosby for Holt. Holt said that there was a possibility that the defendant was involved in the shooting, but the defendant had not been there and did not know anything about it. At the end of this conversation, the detective and Holt both left the church as the prayer service had ended.
Later that night, at approximately 9:00 p.m., Holt called Detective Wright at home and asked the detective to meet with him and the defendant. The detective agreed, and drove to Rutland Road and Utica Avenue to meet them near a restaurant. Holt, the defendant, and the defendant’s aunt, Johnson, approached the detective’s car. The defendant was crying and the detective asked him what he wanted to talk about. The defendant said that he wanted to talk and that he was under a lot of pressure. The defendant and Detective Wright got into the rear seat of the car, leaving the door open. Johnson got into the front passenger seat, and Holt stood outside, leaning into the open door.
Inside the car, the defendant repeated that he was under a lot of pressure and said that he did not mean for this to happen. He said he heard a noise or a commotion that night and was worried about his brother. He went downstairs and asked if his brother was okay. He heard the shots and just fired. He said the person who was shot was his friend and that he was trying to protect his brother. He got rid of the gun afterwards. He said he was not a bad person, that it was an accident, and that he could not eat or sleep. He said that it was on his conscience and that he did not want to go to hell. The defendant said that his deceased mother was looking down on him and asked to go to the church to pray. Detective Wright said that the church was closed and prayed with the defendant inside the car. The prayer was a brief petition for God’s assistance and it lasted one or two minutes. After the prayer, Detective Wright suggested that the defendant turn himself in. The defendant said that he would do it the next day, and the detective responded that that would put the detective in a bad situation. The defendant said that he would turn himself in if the detective went with him and agreed to speak with the police. The detective then drove the defendant and his aunt to the 81st Precinct. Holt did not go with them.
They arrived at the precinct after 11:00 p.m., and Detective Wright brought the defendant to the desk where other detectives came to speak to him. The precinct detectives brought the defendant upstairs to the holding room, followed by Detective *286 Wright. The detective entered the room briefly and prayed with him again, asking for God to give the defendant peace of mind, but did not interview him further. Detective Wright was interviewed by Detective Swantek about the defendant’s statements and related what had occurred. He never said that he could not speak to the detective because the defendant was a member of his church. Detective Wright also spoke briefly with Detective Crosby at the precinct, but did not discuss the defendant’s statements with him. Detective Crosby did not interview the defendant because he was told that the defendant had requested an attorney.
The next day, July 10, 2009, at approximately 12:15 p.m., Detective Crosby spoke to Fuller a second time at the hospital. Fuller stated that there- was a fight occurring outside and that he was trying to get inside the lobby. While he was in the vestibule area between the street and inner doors to the lobby, he saw a man he knew from the neighborhood as Paul come out with an “AK” and fire shots from inside the lobby to the outside of the building. The shots hit Fuller and pushed him back through the window, onto the front stoop of the building. He also saw a man named Hop open the lobby door to the vestibule, and fire to the outside.* Detective Crosby showed Fuller a single photograph of the defendant, and Fuller identified it as Paul.
Conclusions of Law
There is no basis to suppress the first statement, made to Detective Crosby on July 7, 2009 in the 81st Precinct BEAM office, despite the lack of Miranda warnings. At the time of this interview, the defendant voluntarily went to the precinct without any police contact and asked to speak to Detective Crosby. He was not a suspect at the time, made no incriminating statements, and was treated as a potential witness, rather than a suspect. He was permitted to leave the precinct after the interview. The defendant was never in custody, therefore, Miranda rights were not required. (See People v Centano, 76 NY2d 837 [1990]; People v Yukl, 25 NY2d 585 [1969]; People v Perez, 44 AD3d 441 [1st Dept 2007]; People v Stokley, 134 AD2d 542 [2d Dept 1987].) Therefore, this statement is admissible at trial.
The defendant argues that the second statement, made to Detective Wright in his car, was madé to the detective in his capacity as a deacon of the church and is an inadmissible state *287 ment, covered by the clergy-penitent privilege codified in CPLR 4505. The statute provides: “Unless the person confessing or confiding waives the privilege, a clergyman, or other minister of any religion or duly accredited Christian Science practitioner, shall not be allowed [to] disclose a confession or confidence made to him in his professional character as spiritual advisor.” For a communication to fall within this privilege, it must meet four criteria: (1) it must be confidential; (2) it must be made to a minister or clergy member acting in a professional character as a spiritual advisor; (3) it must be made for the purpose of seeking spiritual advice or religious counsel; and (4) it must not be waived by the person making the confidential statement. (See Matter of Keenan v Gigante, 47 NY2d 160, 166-167 [1979].) As the person asserting the privilege, the defendant has the burden of establishing that all four criteria are met. (See People v Drelich, 123 AD2d 441, 443 [2d Dept 1986].)
The privilege applies to any communication between a person and a member of the clergy of any church. It does not require that the person speaking to the clergy belong to the church or the denomination of the clergy person or require any particular form of communication. (See People v Carmona, 82 NY2d 603, 608-609 [1993]; Kohloff v Bronx Sav. Bank, 37 Misc 2d 27 [Civ Ct, NY County 1962].) The determination of whether a statement to a clergy member is privileged “depends not on the contents of the privileged communication but rather on the character of the communication, the relationship between the parties to it and the circumstances under which it was made.” (People v Carmona, 82 NY2d at 610-611 n 2.) Not all communications made to a member of the clergy are privileged: “There must be ‘reason to believe that the information sought required the disclosure of information under the cloak of the confessional or was in any way confidential’ for it is only confidential communications made to a clergyman in his spiritual capacity which the law endeavors to. protect.” (Matter of Keenan v Gigante, 47 NY2d at 166, quoting Matter of Puglisi v Pignato, 26 AD2d 817 [1st Dept 1966].)
Applying the factors to this case the court concludes that the defendant has not established his statement to Detective Wright was privileged. First, there was no showing that the statement was confidential as it was made in the presence of both the defendant’s aunt and his brother, one of the victims of the defendant’s criminal conduct. Communications are not privileged when made in the presence of a third person. (See Lightman v Flaum, *288 278 AD2d 373 [2d Dept 2000] [privilege waived where a sister or a friend was present during the conversation with the rabbi].) Exceptions to this general rule have been made only when the third party is essential to the communication, such as an interpreter, or serving as an agent of the person seeking counsel or the person giving it. (See People v Osorio, 75 NY2d 80, 84 [1989] [discussing attorney-client privilege]; Stroh v General Motors Corp., 213 AD2d 267 [1st Dept 1995] [attorney-client privilege not negated by presence of daughter to facilitate communication by frail elderly victim in a stressful situation].) Similarly, where the lack of privacy is orchestrated by the authorities, the presence of a police officer will not negate the privilege. (See People v Brown, 82 Misc 2d 115 [Sup Ct, NY County 1974] [clergy-penitent privilege not negated where police did not allow defendant to speak privately to his minister]; see also People v Decina, 2 NY2d 133 [1956] [same result under doctor-patient and attorney-client privilege].) The test for whether a third party’s presence negates the privilege is “whether in the light of all the surrounding circumstances, and particularly the occasion for the presence of the third person, the communication was intended to be confidential.” (People v Decina, 2 NY2d at 145; accord People v Osorio, 75 NY2d at 84-85.)
Here, the defendant never sought to speak privately with the detective, although he easily could have done so, either by coming alone to the meeting or by having his family members remain outside the car while he spoke to the detective. Nothing in this record suggests that the family members were needed to assist the defendant in communicating with the officer. Therefore, his statement was neither intended to be confidential when made nor actually made in confidence, and is, therefore, not privileged. (See People v Dixon, 199 AD2d 332 [2d Dept 1993] [defendant’s request to priest to tell victim he was sorry not privileged].)
Nor was there a showing that Detective Wright’s position in the church was akin to that of a minister or clergyman. While the statute was drafted to apply to a broad array of clergy of all denominations and faiths, its application is limited to clergy who perform “significant spiritual counseling which may involve disclosure of sensitive matters.” (People v Carmona, 82 NY2d at 609.) Although Detective Wright had the title of deacon, his duties within the church were purely administrative: he was in charge of music, events planning, church maintenance, and *289 some youth activities. He was not trained in counseling, had never been approached by a church member for advice on anything other than minor personal matters, and testified that, as a deacon, it was “not his position” to talk with parishioners about their sins or to give spiritual guidance. Moreover, the church in which the detective was a deacon had several persons who acted in a counseling and spiritual advisor capacity. These included the pastor, who ran the church and who ordained or appointed the other church officials, and several ministers whose duties were to preach, to counsel and to witness to people. Therefore, the detective’s role as a deacon in this particular church was not that of a clergy person as defined by the statute.
In addition, there was no indication that the detective was acting in a professional character as a spiritual advisor when speaking to the defendant. The defendant’s brother had spoken to Detective Wright earlier that evening at the church to ask him as a detective to intercede with the detective who was investigating the case, because the brother felt he was being harassed. The brother then contacted the detective at his home later that night and arranged to meet outside a restaurant because the defendant wanted to speak to him. Neither the brother nor the defendant sought to meet inside the church or otherwise indicated to the detective that the defendant was seeking spiritual, rather than practical, advice. These circumstances, coupled with the presence of the defendant’s family members, establish that the detective was not acting in a professional capacity as a spiritual advisor.
This case is unlike Matter of Lewis v New York City Hous. Auth. (151 AD2d 237 [1st Dept 1989]), upon which the defendant relies. Matter of Lewis involved a housing police officer who was also an ordained minister. While in his church and dressed in a suit and tie, the officer was approached by a man who gave him a gun. The officer’s assertion of the clergy-penitent privilege to refuse to reveal the man’s identity was upheld because the circumstances of the surrender provided reason to believe that the communication was privileged and there was no proof that the man had approached the officer in his law enforcement capacity, rather than as a minister. Here, the circumstances indicate the opposite: the detective was not approached at the church, he was not an ordained minister, but an administrative functionary of the church, and the defendant was well aware both of his position within the church and of his role as a detective. Moreover, his brother had sought the detective’s assistance *290 earlier that evening to intercede in his law enforcement capacity with the detective investigating the case.
While factually much closer, the circumstances also show that this communication was not made for the purpose of seeking religious guidance or spiritual advice. Although the defendant did express that the shooting was on his conscience, that he did not want to go to hell, and that he wanted to pray at the church, he did not say any of these things until after he had already told the detective that he had accidentally shot his friend while trying to protect his brother. By first revealing his problem and only later asking for prayer or some kind of spiritual solace, it is clear that the defendant’s original reason for speaking to the detective was not to seek religious advice or spiritual counsel, but to ask a sympathetic member of law enforcement for practical counsel on his situation. (Compare People v Reyes, 144 Misc 2d 805 [Sup Ct, Queens County 1989].) In Reyes, after a shooting, the defendant went to a church, asked to speak to the priest and then confessed that he had hurt his mother and still had the gun in his possession. The priest suggested that the defendant turn himself in, but the defendant said that he just wanted to pray. This communication was held to be privileged because the circumstances showed that the defendant was seeking some type of spiritual advice and intended that his conversation with the priest was to be kept secret. Similarly, in Carmona (82 NY2d at 609-610), the defendant’s communication was privileged because he specifically requested to speak to the minister because he “had a problem” and “needed spiritual help,” and the defendant discussed his standing under religious laws with both ministers he consulted.
In this case, the fact that the defendant sought prayer or consolation after unburdening himself does not alter the fact that the statement, when made, was not made as a request for religious guidance or spiritual counsel. Moreover, because the defendant and his family members had attended or belonged to the church and because his aunt held an office within the church, the defendant was fully aware of the roles of the different church officials and also fully aware of the detective’s dual roles both within the church and as a detective. Therefore he knew when he confessed to the shooting that he was not speaking to a member of the clergy at this church who would ordinarily give spiritual guidance or counseling.
Finally, waiver of a privilege occurs when the person making the otherwise privileged statement reveals to a third party both *291 the statement’s contents and the fact that it was made to the clergy member. (See People v Carmona, 82 NY2d at 611.) Here, by speaking in front of his aunt and brother, the defendant effectively waived any claim of privilege. Therefore, the claim that the statement must be precluded based on the privilege is denied.
Evaluated as a statement made to law enforcement, the statement to Detective Wright is admissible at trial. The defendant was not in custody when he arranged to meet Detective Wright on the street to speak to him, and the detective had no reason to believe that the defendant was involved in the crime before the conversation began. Indeed, he had been specifically informed by one of the victims that the defendant had not been present during the shooting incident and had no knowledge of it. There was no indication that Detective Wright asked any questions of the defendant during the conversation inside the car. The only question he asked, “What do you want to talk about?” was an innocuous inquiry and was neither a calculated attempt to obtain an incriminating statement nor at all accusatory. Under these circumstances, the statement was noncustodial, spontaneously made, and not the product of any police interrogation. For all of these reasons, the statement is admissible even though Miranda warnings were not issued. (See People v Taylor, 82 AD3d 1133 [2d Dept 2011]; People v Myers, 303 AD2d 139 [2d Dept 2003]; People v Lynes, 49 NY2d 286 [1980].)
Therefore, and for the foregoing reasons, defendant’s motion to suppress the statements is denied in all respects.

 Hop was never identified or interviewed.