# SUPREME COURT OF THE STATE OF NEW YORK
## *Appellate Division, Fourth Judicial Department*

**552**

**KA 08-01674**

PRESENT: SCUDDER, P.J., CENTRA, LINDLEY, SCONIERS, AND MARTOCHE, JJ.

---

THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT,

V                                                  MEMORANDUM AND ORDER

JAMES E. GUILFORD, DEFENDANT-APPELLANT.

---

FRANK H. HISCOCK LEGAL AID SOCIETY, SYRACUSE (PIOTR BANASIAK OF COUNSEL), FOR DEFENDANT-APPELLANT.

WILLIAM J. FITZPATRICK, DISTRICT ATTORNEY, SYRACUSE (JAMES P. MAXWELL OF COUNSEL), FOR RESPONDENT.

---

Appeal from a judgment of the Onondaga County Court (Joseph E. Fahey, J.), rendered May 27, 2008. The judgment convicted defendant, upon a jury verdict, of murder in the second degree.

It is hereby ORDERED that the judgment so appealed from is affirmed.

Memorandum: Defendant appeals from a judgment convicting him upon a jury verdict of murder in the second degree (Penal Law § 125.25 [1]) based on the charge that he killed the victim on or around February 6, 2007. The victim was the ex-girlfriend of defendant who lived with him in Syracuse and was the mother of his children. Within days after the victim's disappearance, defendant took the children to Georgia to stay with his mother. Detectives from the Syracuse Police Department (SPD) traveled to Georgia and interviewed defendant there on February 20, 2007. Defendant returned to Syracuse on March 20, 2007, and was interrogated by SPD detectives over a period of 49 hours. Near the end of the interrogation, defendant told the detectives that he wanted an attorney and that he wanted to speak with the Assistant District Attorney. An attorney was appointed for defendant and, after meeting with his attorney as well as a break in the interrogation, defendant made statements to the detectives in the presence of his attorney on March 23, 2007.

We reject defendant's contention that County Court erred in refusing to suppress the statements that he made to SPD detectives in Georgia on February 20, 2007. According to the decision of the suppression court, even assuming, arguendo, that defendant was in custody, the court determined that he knowingly and voluntarily waived his *Miranda* rights before speaking with the detectives. The evidence presented at the suppression hearing supports that determination (*see People v Sands*, 81 AD3d 1263, 1263, *lv denied* 17 NY3d 800). We

further agree with the court that defendant's statement, "[w]hen I asked them if I needed to speak to an attorney, they just made it seem like I couldn't get one at that time" was not an unequivocal request for counsel (*see generally People v Hicks*, 69 NY2d 969, 970, *rearg denied* 70 NY2d 796).

We reject defendant's further contention that the court erred in refusing to suppress the statements that he made to SPD detectives in Syracuse on March 23, 2007. The court suppressed the statements that defendant made during the preceding 49-hour interrogation. The court held that, although defendant was advised of his *Miranda* rights, under the totality of the circumstances the People did not meet their burden of proving that defendant's statements made during "this unprecedented and lengthy period were voluntary" beyond a reasonable doubt. We concur with the court that the length of the interrogation was unparalleled and should in no way be condoned. With respect to the March 23, 2007 statements, however, the court determined that they were admissible because there was an eight-hour "definite, pronounced break" between the 49-hour interrogation and those statements. The court explained that any taint from the prior interrogation was dissipated by the break in the interrogation, by the assignment of an attorney and opportunities to consult with that attorney before the March 23, 2007 statements were made, by defendant's removal from the interrogation room and his opportunity to sleep the remainder of the night before being arraigned, and by defendant's having made the statements in question while speaking with the detectives the following morning in the presence of his attorney. We agree. In particular, we note that, once an attorney was appointed for defendant and defendant had the opportunity to consult with the attorney before again speaking with the detectives, in the presence of his attorney, it cannot be said that the statements were involuntary or the "product of compulsion" (*Miranda v Arizona*, 384 US 436, 466).

Defendant failed to preserve for our review his contention that he was denied a fair trial by prosecutorial misconduct (*see People v Milton*, 90 AD3d 1636, 1637) and, in any event, that contention is without merit. Any alleged misconduct was not so egregious as to deny defendant a fair trial (*see People v Pringle*, 71 AD3d 1450, 1450-1451, *lv denied* 15 NY3d 777; *People v Foster*, 59 AD3d 1008, 1009, *lv denied* 12 NY3d 816). Defendant further contends that he received ineffective assistance of counsel because his attorney should not have allowed him to give a statement to the detectives. Defense counsel was not ineffective, however, for making a "strategic decision to encourage defendant to cooperate in order to receive favorable treatment" (*People v Carncross*, 14 NY3d 319, 332). Indeed, the evidence at the suppression hearing established that defendant wanted to "cut a deal" and was in fact offered a sentence cap if he cooperated. We have reviewed the remaining instances of alleged ineffective assistance of counsel raised by defendant and nevertheless conclude that he received meaningful representation (*see People v Baldi*, 54 NY2d 137, 147).

CENTRA and SCONIERS, JJ., concur; SCUDDER, P.J., concurs in the following Memorandum: I agree with the majority that County Court

properly refused to suppress defendant's inculpatory statements made in the presence of counsel.  I write separately, however, to clarify that, in my view, those statements are voluntary not only because they were sufficiently attenuated from statements determined to be involuntary (*see generally People v Paulman*, 5 NY3d 122; *People v Bethea*, 67 NY2d 364; *People v Chapple*, 38 NY2d 112), but also, independently of the attenuation, because they were made following consultation with his counsel and in the presence of his counsel.

I am mindful of *People v Concepcion* (17 NY3d 192) and note that my analysis does not improperly recommend that we affirm the court's suppression ruling on a ground rejected by the suppression court, or on a ground upon which it ruled in defendant's favor (*cf. id.* at 196; *see generally People v LaFontaine*, 92 NY2d 470, 474).  Indeed, *Concepcion* and *LaFontaine* are "only implicated when an appellate court affirms a case on a ground that was not decided *adversely* to the [defendant] at the trial level" (*Concepcion*, 17 NY3d at 197).  Here, the court explicitly addressed defendant's opportunities to consult with counsel prior to making the statements and noted that the statements were made with the benefit of the assistance of counsel.  Thus, I submit that, as part and parcel of its decision that the statement was voluntary, the court implicitly determined that the assistance of counsel rendered the statement voluntary, and thus decided that issue adversely to defendant.

Although defendant was required to endure 49 hours of interrogation, he nevertheless eventually invoked his right to counsel, whereupon the police ceased the interrogation.  Defendant conferred with his assigned attorney for a period of two hours that evening and for approximately 15 minutes the following morning before again speaking to the police.  With his counsel present, defendant told the police,  "I killed her" and that he had placed the victim's body in a dumpster.

More than 50 years ago, the Supreme Court reiterated that "basic rights that are enshrined in our Constitution [are] that 'No person . . . shall be compelled in any criminal case to be a witness against himself,' and that 'the accused shall . . . have the Assistance of Counsel' " (*Miranda v Arizona*, 384 US 436, 442).  The Court established "procedural safeguards . . . to secure the privilege against self-incrimination" (*id.* at 444), in order to ensure that the right "to remain silent . . . or to speak without intimidation, blatant or subtle," (*id.* at 466) is not "put in jeopardy . . . through official overbearing" (*id.* at 442).  The *Miranda* Court was clear: "[t]he presence of counsel . . . would be the adequate protective device necessary to make the process of police interrogation conform to the dictates of the privilege [against self-incrimination].  His [or her] presence would insure that statements made in the government-established atmosphere are not the product of compulsion" (*id.* at 466).  "The presence of counsel confers no undue advantage to the accused.  Rather, the attorney's presence serves to equalize the positions of the accused and sovereign, mitigating the coercive influence of the State and rendering it less overwhelming" (*People v Rogers*, 48 NY2d 167, 173).  Here, defendant exercised his right to

counsel and thereby safeguarded his right to remain silent or to speak without intimidation (*see Miranda*, 384 US at 466), and thus the court properly determined that defendant's statements were voluntary.

LINDLEY and MARTOCHE, JJ., dissent and vote to reverse in accordance with the following Memorandum:  We respectfully dissent. We agree with the majority that County Court properly refused to suppress the statements by defendant in Georgia to detectives from the Syracuse Police Department (SPD).  We also agree with the majority that the court properly suppressed the statements made by defendant during his interrogation that lasted from 11:30 P.M. on Friday, March 20, 2007 to 1:00 A.M. on Monday, March 23, 2007, a total of 49½ hours. We disagree with the majority, however, that the subsequent statements made by defendant eight hours later on March 23 were voluntarily made and thus admissible because there had been a break in the interrogation and because defendant had been assigned an attorney at his request, and was given the opportunity to consult with the attorney before making the subsequent statements to the detectives, in the presence of his attorney.

On February 8, 2007, defendant filed a missing person report regarding his ex-girlfriend and the mother of his three children. Although the relationship had ended, defendant and his ex-girlfriend were still living together and, immediately after making the missing person report, defendant left Syracuse to move to Georgia with the children.  In the course of the investigation regarding the missing person report, the police identified defendant as a suspect in the disappearance.  On February 19, detectives from the SPD traveled to Georgia to speak with defendant.  Defendant voluntarily accompanied the detectives to a Sheriff's station house in Georgia, where he executed a *Miranda* waiver at 10:35 A.M. on February 20 and was questioned until 6:30 A.M. on February 21.  In the course of that interrogation, defendant signed a consent-to-search form for his vehicle and took a polygraph examination.  He also consented to a DNA swab test.

Shortly thereafter, defendant moved back to Syracuse.  On March 20, defendant agreed to speak to the SPD detectives and was taken to the SPD's Criminal Investigation Division (CID).  There, rotating teams of detectives interrogated defendant between March 20, 2007 at 11:30 P.M. and March 23, 2007 at 1:00 A.M.  At the onset of the interrogation, defendant was advised of, and waived, his *Miranda* rights.  One of the interrogating officers testified that, during the course of the 49½-hour interrogation, defendant was allowed to sleep "in the chair, on the floor, whatever he wanted to do," and would have had a blanket "if he had asked for one."  Nevertheless, the court credited defendant's testimony at the suppression hearing that he never slept during that interrogation.  Also during the course of that interrogation, defendant made numerous statements suggesting that he was involved in the disappearance of his ex-girlfriend.  For example, in the early morning hours of March 21, he stated, "it makes me look guilty doesn't it?"  Slightly later that morning, he stated, "I'm f***ed" and, "[i]f I were you guys, I wouldn't let me go."  In the early morning hours of March 22, defendant made the following

statements:  "[I]t's hard as f***," and "I'm gonna go to jail."  Later that morning, he expressed his desire to go to jail and to kill himself.  Finally, at about 8:30 P.M. on March 22, the lead detective who supervised the interrogation informed defendant that he would be charged with murder.  According to the detective's hearing testimony, defendant told the detective that he wanted to "cut a deal basically to tell us where her body was" as long as the detective obtained an attorney for defendant and allowed him to speak to the Assistant District Attorney (ADA) with whom he had previously spoken.  That ADA had spoken to defendant for 45 minutes at about 7:30 P.M. on March 22.  The ADA testified that his conversation with defendant was a "last effort . . . to get him to open up."  The ADA left when his "last effort" appeared unavailing, but he shortly thereafter received a telephone call from the detective requesting that he return and make arrangements for defendant to obtain counsel.

The ADA thereupon advised defense counsel that, if defendant revealed the location of the body, his sentence would be capped at a term of incarceration of 18 years to life.  Defense counsel spoke to defendant, and then informed the SPD that defendant would not speak to them any further that night.  Defendant was booked and placed in a holding cell at approximately 1:30 A.M. on March 23 and, following his arraignment in the morning, he returned to the SPD.

Defense counsel testified that he was not told how long defendant had been interrogated and was not shown any police reports.  He further testified that defendant appeared "emotional and distraught," although he could not recall whether defendant appeared fatigued.  Defendant testified that he offered to make a written statement after he told the police that he was so tired that he would sign anything they wrote.  Immediately after defendant's arraignment at 9:30 A.M. on March 23, defendant advised defense counsel that he wanted to speak to the police and was willing to reveal the location of the body.  He was then returned to the CID and was placed in the same room where he had been previously interrogated for 49½ hours.  The lead detective questioned defendant in the presence of the ADA and defense counsel and, when the lead detective asked, "What happened?" defendant responded, "I killed her."

Defendant moved to suppress, inter alia, all statements made in Georgia and in Syracuse, between March 20 and March 23, 2007.  The suppression court concluded that the statements made to the SPD detectives in Georgia were admissible because defendant had knowingly and voluntarily waived his *Miranda* rights and was not in custody.  The suppression court further concluded that the statements made by defendant during the course of the 49½-hour interrogation between 11:30 P.M. on March 20, 2007 and 1:00 A.M. on March 23, 2007 were made involuntarily and were inadmissible at trial.  Specifically, the court determined that the People failed to meet their burden of proving that the statements "made during this unprecedented and lengthy period" were voluntarily made beyond a reasonable doubt, citing *Greenwald v Wisconsin* (390 US 519).  The suppression court further determined that those statements "were obtained in violation of *Miranda* rights; were made involuntarily in the 'traditional due process' and in

contravention of CPL [] 60.45," and could not be used against defendant at trial.

The suppression court further determined, however, that the statements made by defendant on March 23 after his arraignment were admissible because the statements were voluntarily made. The suppression court determined that any taint from the 49½-hour interrogation had been dissipated by "the break in interrogation; the assignment of counsel and opportunities to consult with that counsel; and by Defendant's removal from the interrogation room and opportunity to sleep for the remainder of the night before being arraigned and returning to speak with police in the presence of counsel the next morning." The court concluded that the roughly eight-hour break was sufficient to attenuate any taint from the prior 49½-hour interrogation and that the statements were not obtained as a result of a continuous chain of events.

Preliminarily, we note that the People contend that defendant failed to preserve for our review his challenge to the legal standard to be applied on the ground that defendant failed to raise that challenge before the suppression court. We reject the People's contention for the obvious reason that defendant could hardly have been expected to predict the legal standard that the court would apply in its decision. With respect to the merits of his challenge to the legal standard applied by the court, however, we conclude that there is no appreciable difference between the standard that he would urge upon this Court and that applied by the suppression court. The suppression court ruled that the taint from the initial circumstances of the interrogation was dissipated by the break in the interrogation, and by the assignment of counsel and the presence of counsel when defendant made the subsequent statements that were ruled admissible. In our view, the court's analysis properly considered the standards of the federal "fruit of the poisonous tree" cases relied upon by defendant (*see e.g. Oregon v Elstad*, 470 US 298, 305-308).

The suppression court and the majority conclude that two key factors attenuated defendant's clear admission of guilt from his prior 49½-hour interrogation, i.e., the break in the interrogation and the assignment and presence of counsel. In our view, under the circumstances of this case neither of those factors is sufficient to create an adequate attenuation.

We begin our analysis with a discussion of the 49½-hour continuous interrogation conducted by rotating teams of police officers. The interrogation occurred inside a locked room that was 10 feet by 10 feet. Except for bathroom breaks, during which defendant was accompanied by a detective, defendant spent the entire 49½-hour period in the interrogation room. As the suppression court stated in its findings of fact, the only food consumed by defendant during his continuous interrogation was a single sandwich, which he consumed early in the evening on March 21. That was approximately 20 hours after he was taken into custody and 40 hours before he confessed on the morning of March 23, a point that bears emphasis. From early Saturday evening to Monday morning when he confessed, defendant ate

not a morsel of food.

In addition, as the suppression court further stated in its findings of fact, there is no evidence that defendant slept during his 49½ hours in the interrogation room.  In fact, the People, who as noted had the burden of proving the voluntariness of defendant's statements beyond a reasonable doubt (*see People v Rosa*, 65 NY2d 380, 386), offered no evidence that defendant slept while he was in the holding cell awaiting arraignment.  The suppression court set forth in its findings of fact that defendant had an "opportunity to sleep" in the holding cell, but there was no evidence adduced at the hearing that defendant actually slept or that the conditions in the holding cell were such that it was even possible for defendant to sleep.  Thus, it appears that defendant may have been awake for 50 hours immediately preceding his confession.  That does not take into account the fact that defendant was picked up by the police at 10:30 P.M. on March 20 and probably had been awake for quite some time on that day (*see People v Anderson*, 42 NY2d 35, 39 ["As (defendant) had been transported to police headquarters an hour after midnight, his hours in the interrogation room must be added to those which had elapsed since the time he had arisen from his bed on the morning of the day before"]).

In *Ashcraft v State of Tennessee* (322 US 143), Justice Black, writing for a majority of the United States Supreme Court, considered the admissibility of a confession made following a continuous 36-hour interrogation conducted by rotating teams of police officers.  The Court concluded that the interrogation was "so inherently coercive that its very existence is irreconcilable with the possession of mental freedom by a lone suspect against whom its full coercive force is brought to bear" (*id*. at 154).  The Court continued, "It is inconceivable that any court of justice in the land, conducted as our courts are, open to the public, would permit prosecutors serving in relays to keep a defendant witness under continuous cross[-]examination for thirty-six hours without rest or sleep in an effort to extract a 'voluntary' confession" (*id*.).  We recognize that *Ashcraft* predates the seminal ruling of the United States Supreme Court in *Miranda v Arizona* (384 US 436) and that, here, defendant, as found by the suppression court, waived his right to counsel.  Thus, defendant and the suspect in *Ashcraft* were not in identical situations, given that the suspect in *Ashcraft* was not afforded the opportunity to have counsel present at his questioning.  Despite that distinction, we note the Court's condemnation of a lengthy and continuous interrogation.

Indeed, research has shown that the possibility of a false confession increases based on the setting and length of the interrogation (*see* Gutierrez, *You Have The Right [to plead guilty]: How We Can Stop Police Interrogators From Inducing False Confessions,* 20 S Cal Rev L & Social Justice 317 [Spring 2011]).  In fact, as noted in the above-referenced article, in a study of 125 confessions proven to be false, the mean interrogation time was 16.3 hours, which is substantially longer than the 4-hour interrogation time that is otherwise recommended (*id.* at 338-339).  As the author notes, "the

long interrogation time combined with isolation, hunger, and sleep deprivation can lead to false confessions" (*id.* at 339). Even in the post-*Miranda* cases, the United States Supreme Court has "consistently indicated that the Due Process inquiry must focus on the propriety of the interrogation methods, not the reliability of the particular confession" (White, *What Is An Involuntary Confession Now*?, 50 Rutgers L Rev 2001, 2022 [Summer 1998]).

While the majority concludes, as do we, that the 49½-hour continuous interrogation conducted here offends basic principles of due process, we part ways with respect to whether "the connection between the lawless conduct of the police and the discovery of the challenged evidence has 'become so attenuated as to dissipate the taint' " (*Wong Sun v United States*, 371 US 471, 478; *see People v Stith*, 69 NY2d 313, 317-318; *People v Rogers*, 52 NY2d 527, 532-533, *rearg denied* 54 NY2d 753, *cert denied* 454 US 898, *reh denied* 459 US 898). With respect to the approximately eight-hour "break" in interrogation, the issue is whether "a definite, pronounced break in the interrogation . . . may be said to have returned [the defendant], in effect, to the status of one who is not under the influence of questioning" (*People v Chapple*, 38 NY2d 112, 115). In our view, the relatively brief "break" in interrogation, following a continuous 49½-hour interrogation, was not sufficient to return defendant to the status of one who is not under the influence of questioning. We consider not only the extraordinary and draconian length of the interrogation, but we also consider the fact that defendant may have believed himself "so committed by a prior statement that he [felt] bound to make another" (*People v Tanner*, 30 NY2d 102, 106). In *United States v Bayer* (331 US 532, 540, *reh denied* 332 US 785), the United States Supreme Court discussed that latter theory as follows: "[A]fter an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good."

Although defendant did not directly inculpate himself in his statements during the 49½-hour interrogation, there is no question that he made statements that were indicative of his involvement in the crime. Notably, his final statement at the end of the 49½ hours of interrogation was, "I'll give everybody what they want [in exchange for a plea deal and an attorney]," a statement that strongly suggests that defendant believed that he had no choice but to confess to the crime in order to receive a favorable plea deal and an attorney. In our view, the police exploited defendant's lengthy detention in such a way that it can be said to have "produced" his later inculpatory statements (*Rogers*, 52 NY2d at 535). This is not a case in which the defendant was released from the strictures of an interrogation during which he made no inculpatory remarks, and then made a "subsequent unprompted decision to make a statement" (*People v Kinnard*, 62 NY2d 910, 912; *see People v Dunn*, 83 AD3d 1421, *lv denied* 17 NY3d 794). As the United States Supreme Court noted in *Ashcraft*, persistent questioning, continuing hour after hour by relays of officers, along with the deprivation of sleep, "is the most effective torture and certain to produce any confession desired" (*Ashcraft*, 322 US at 150 n

6 [internal quotation marks omitted]).

The relatively brief break afforded to defendant after he essentially agreed to confess to the crime did not provide defendant with any freedom. Instead, he remained in his holding cell before he was taken to City Court for arraignment, whereupon he was immediately questioned by one of the same detectives who was involved in the 49½-hour interrogation. As noted, there is no evidence that defendant was provided food or that he slept during the eight hours he was in the holding cell. Under the circumstances, that "break" could hardly have "attenuated" defendant's statements immediately following arraignment from the prior coercive and extraordinarily lengthy interrogation.

We also reject the majority's reliance on the fact that counsel was present when defendant made his directly inculpatory statements. First, although defendant was represented by counsel during his post-arraignment statements, defendant was given comparatively little time to speak to defense counsel and in fact testified that he was concerned that the attorney was a disguised police officer, a suspicion that, given the rotating teams of police interrogators during the 49½-hour period, appears somewhat reasonable. There is no indication in the record that defense counsel was aware of the length of the interrogation and the fact that defendant had made implicitly inculpatory statements.

In addition, the presence of counsel did nothing to improve defendant's cognitive functioning, which necessarily was adversely affected by the prolonged lack of food and sleep. "The potential effect on human beings of the lack of such elemental needs as sleep and sustenance requires no elaboration. Case law repeatedly has emphasized the vital effect that the resultant 'slowly mounting fatigue' may be expected to have on a person's judgment and will" (*Anderson*, 42 NY2d at 40, quoting *Spano v New York*, 360 US 315, 320, *remittitur amended* 7 NY2d 729; *see Greenwald*, 390 US at 521 [defendant had no food for 12 hours while in custody]; *Sims v Georgia*, 389 US 404, 407 [defendant had no food for eight hours while in custody]).

As Justice Brennan and two other dissenters noted in a slightly different context in *McMann v Richardson* (397 US 759, 778 [Brennan, J., dissenting]), we should decline to "attach talismanic significance to the presence of counsel" where otherwise coercive pressures have been brought to bear upon a defendant. Certainly, the presence of counsel during his post-arraignment interrogation is a factor to be considered, but we conclude that the presence of counsel alone cannot, following a 49½-hour continuous interrogation proceeded by a brief break nullify the coercive effect of the prior interrogation. We agree with the reasoning of the Supreme Court of Iowa, as follows: "Consultation with an attorney would not insulate defendant from the psychological consequences of the promises made" to him (*State v Kase*, 344 NW2d 223, 226).

In our view, the specific circumstances of this case militate strongly in favor of suppression of the statements that followed the 49½-hour interrogation. In *Anderson* (42 NY2d 35), the Court of

Appeals considered the involuntariness of a confession under the totality of the circumstances and looked at the following factors: the length of the continuous interrogation (19 hours), the deprivation of sleep during that period, the use of rotating teams of officers conducting prolonged and persistent questioning, and the isolation of defendant from friends and family during that period (*id.* at 39-40). The only factor in *Anderson* that distinguishes it from this case is that the defendant in *Anderson* was not made aware of his right to counsel until the interrogation had been underway for 13 hours. Again, while we agree that the waiver of *Miranda* rights and the ultimate presence of an attorney are factors to be considered in determining the voluntariness of a confession, we conclude that they do not outweigh all of the other factors considered in *Anderson*.

Finally, we consider whether the failure to suppress defendant's confession constitutes harmless error. Confessions " 'are probably the most probative and damaging evidence' that can be introduced against the defendant" (*People v Carmona*, 82 NY2d 603, 614). That does not mean, however, that the admission of an inadmissible confession can never be harmless error. Here, there was significant circumstantial evidence implicating defendant in the crime. We cannot conclude, however, that there is no reasonable probability that the confession contributed to his conviction (*cf. id.* at 614-615; *People v Watson*, 90 AD3d 1666, 1667). We conclude, therefore, that defendant's statements made on March 23 immediately following his arraignment should have been suppressed, and we would grant a new trial.

Entered:  June 8, 2012                          Frances E. Cafarell
                                                Clerk of the Court